Note by Reporter—Original case decided October 3, 1911. See Advance Sheet No. 3, page 250 (Vol. 145).

---

## Banks v. Commonwealth.

(Decided December 15, 1911.)

### Appeal from Todd Circuit Court.

1.  Courts—Special Terms of Circuit Courts—Constitutional Law.— The constitution does not mention special terms of the Circuit Court, but this fact does not furnish any reason why the legislature should not make provision for them. The well established principle controlling State legislation is that the legislature has authority to pass such laws as are not prohibited by the constitution.

2.  Same—Special Terms of Circuit Court.—The legislature in section 964 of the Kentucky Statutes gives to the circuit judge, or

the judge holding the regular term, the right to order a special term whenever it is necessary to transact the business of the court. There is no limitation imposed by the statute upon the authority conferred.

3. Same—Presumption That Special Term is Necessary.—The presumption is that a special term will not be called unless in the judgment of the judge it is necessary for the transaction of the business of the court; and, this presumption cannot be overcome by showing that a case set for a special term might be disposed of at a regular term, or that the court docket was not so crowded as to make the calling of a special term necessary.

4. Same—Courts of General Jurisdiction.—The Circuit Court is a court of general jurisdiction, and the presumption of validity follows all orders and judgments made and entered by it, except in cases in which the statute has expressly pointed out that certain facts must appear in the record before it can have jurisdiction.

5. Evidence—Non-expert Witnesses in Criminal Cases.—Non-expert witnesses who have qualified themselves by observation of and association with the accused are competent to express an opinion as to his soundness of mind at the times they had opportunity to and did observe his traits of character, although they may not be able to express an opinion as to the condition of his mind at the immediate time of the act under investigation.

6. Same.—Non-expert witnesses who have qualified themselves to speak may in addition to expressing an opinion as to the soundness of mind of the accused, express an opinion as to whether or not he had mind enough to know right from wrong.

7. Insanity—"Paranoia," a species of insanity, is not so singular an ailment as that no person except he be versed in diseases of the mind is qualified to speak concerning it.

8. Same—Legal Test of Non-responsibility.—In every case where insanity is a defense, the accused is allowed the widest latitude in bringing before the jury the peculiarities of the particular affection he is suffering with; but, when he has done this, he must submit to the inexorable test that it is only mental unsoundness or mental disease that will save him from the consequences of his act.

9. Same—Moral Insanity.—We do not recognize moral insanity as an excuse for crime. The insanity that will excuse violations of the law must be the result of mental disease.

10. Criminal Law—Insanity—Instructions.—An instruction that the law presumes every man sane until the contrary is shown by the evidence, and, before a defendant can be excused on the ground of insanity the jury must believe from the evidence that he was at the time of the killing without sufficient reason to know what he was doing or had not sufficient reason to know right from wrong, or that as the result of mental unsoundness he had not then sufficient will power to govern his actions by reason of some insane impulse which he could not resist or control is proper.

11. Criminal Law—Instructions—"Malice aforethought."—It is usual and proper in cases in which the facts authorize an instruction upon the subject of capital punishment and the degrees of the offense, to define in the instructions the words "malice afore- thought," but the omission of these words, in a case in which the evidence shows the defendant to be guilty of murder or noth- ing, is not prejudicial.

.S. WALTON FORGY, DORSEY & STANLEY for appellant.

SELDON Y. TRIMBLE, TRIMBLE & BELL, JAMES BREATHITT, Attorney General and THOS. B. BLAKEY, Assistant Attorney Gen- eral for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

The appellant under an indictment charging him with the murder of Mrs. Elizabeth Sebree was convicted and sentenced to confinement in the State penitentiary for life. His only defense was that at the time of the homi- cide he was afflicted with that species of insanity known as "paranoia," and, therefore, not responsible for his act.

Before considering the law applicable to his defense, the questions raised as to the admissibility of evidence, and the correctness of the instructions, we will dispose of some preliminary questions presented by counsel.

The appellant was indicted by the grand jury of Todd County in December, 1910. At the March term, 1911, the prosecution was continued—not to the next regular term of the court which convened in July, 1911, but to a special term which was called for May 5th, 1911—and at this special term the trial was entered into and concluded. The order of court entered at the March term calling the special term and setting this case for trial thereat, is as follows:

"It appearing that it is necessary in order to trans- act the business of this court, it is now ordered that a special term of the Todd Circuit Court be and it is here- by called to meet at Elkton, Todd County, Kentucky, on Friday, the 5th day of May, 1911, for the trial of the case of the Commonwealth of Kentucky v. Morris Banks, on the charge of wilful murder; and said court will continue until said case is tried and disposed of. To all of which the defendant by his attorney objects and excepts."

It is now the contention of counsel for the appellant that this order calling the special term must be treated

as void; and, therefore, as the trial of appellant was not had at a term of the circuit court called or held under authority of law, it must be treated as a nullity and the judgment of conviction set aside. The argument made in support of this is that the circuit judge in calling special terms exercises a limited jurisdiction and has no authority to make the call unless it appears that the business can not be transacted at and during the regular term fixed by the statute; and that when a special term is called, the order of the court calling it must set out as a jurisdictional fact the reasons why it is necessary to call the term.

It is provided in section 131 of the Constitution that:

"There shall be at least three regular terms of the circuit court in each county every year."

In compliance with this section of the Constitution, provision is made in section 965 of the Kentucky Statutes for the holding of three regular terms of the circuit court in each county in the State except in those in which there are courts of continuous session. The constitution does not mention special terms of the circuit court or make any provision for the calling of such terms. Special terms are neither prohibited nor authorized by the Constitution, but this circumstance does not furnish any reason why the legislature should not make provision for special terms. It is not at all essential to the validity of legislation that there should be express warrant for it in the Constitution. The well established principle controlling the State Legislature is that it has authority to pass such laws as are not prohibited by the Constitution. When there is no constitutional limitation upon its authority, the Legislature may act. Griswold v. Hepburn, 2nd Duv., 20; L. & N. R. R. Co. v. Herndon, 126 Ky., 589. The Legislature having ample authority to provide special terms, did so in section 964 of the Kentucky Statutes, reading:

"In each county of said districts, except counties having continuous session, there shall be held each year the number of terms of the circuit court provided for by law, and the term in any district may be extended, if the business requires, so that it does not interfere with any other term in the district; and whenever it is necessary to transact the business, a special term may be held in any county, either by an order entered of record at the last preceding regular term in the county or by

notice signed by the judge and posted at the courthouse door of the county for ten days before the special term is held. The order or notice shall specify the day when the special term is to commence, and shall give the style of each case to be tried, or in which any motion, order or judgment may be made or entered at the special term." * * *

The statute leaves to the circuit judge or the judge holding the regular term the right to order a special term whenever it is necessary to transact the business of the court.

There is no limitation imposed by the statute upon the authority conferred. Of course the Legislature could not make specific provision for the calling of special terms, because the legislative department could not know in advance what the condition of the business in any given district might be or whether it would be necessary to have special terms or not; and so, as the power to order special terms must be lodged in some person or tribunal, it is apparent that the judge of the court is the most appropriate person to be vested with this authority. In the conduct of the business of the district and court, the circuit judge is presumed to be and is better advised than any other person as to the necessity for holding special terms to transact with expedition the business of the court, and it would be a most extraordinary state of case in which we would feel inclined to interfere with the judgment of the judge as to the necessity for calling a special term. Blimm v. Commonwealth, 7 Bush, 320; Huber v. Armstrong, 7 Bush, 590; White v. Commonwealth, 120 Ky., 178; Penman v. Commonwealth, 141 Ky., 660.

Nor is counsel correct in asserting that the circuit court or the judge thereof in calling a special term is a court of limited jurisdiction and, therefore, when it acts the record must show the facts necessary to confer jurisdiction—that is, the reason why it is necessary to call the term. It is true that when courts of limited jurisdiction act, the record must show the existence of the jurisdictional fact. Freeman on Judgments, volume 1, section 123; Jacob's Admr. v. L. & N. R. R. Co., 10 Bush, 263; Taylor v. Moore, 112 Ky., 330. But the circuit court is not a court of limited or special jurisdiction. It is a court of general jurisdiction, and the presumption of validity follows all orders and judgments made and

entered by it, except in cases in which the statute has expressly pointed out that certain facts must appear in the record before it can have jurisdiction, which it does not do in respect to the matter we are considering. In cases in which the statute does not expressly point out the jurisdictional facts necessary to confer jurisdiction, the party assailing the verity of its orders and judgments must affirmatively show that it did not have jurisdiction. It is not necessary that the jurisdictional facts should appear in the record. Freeman on Judgments, section 122; Jacob v. L. & N. R. R. Co., supra; Crown Real Estate Co. v. Rogers, 132 Ky., 790.

Coming now to the merits of the case—Mrs. Sebree, whom the appellant, an unmarried man about twenty-six years of age killed, was his aunt, a widow about sixty years old, and a most estimable woman. She was killed in cold blood, without excuse or provocation, on the streets of the little town of Trenton about 10 o'clock in the forenoon. . Briefly the facts immediately relating to the homicide are these: Appellant went to the home of a Mr. Cook and borrowed a shot gun. Leaving the residence of Mr. Cook in a buggy, he drove to a point in front of the postoffice in Trenton. As he drove up, Mrs. Sebree was approaching in a buggy from another direction. Without speaking to any one, appellant got out of his buggy, walked a few steps towards the buggy in which Mrs. Sebree sat, and without any exchange of words between them, deliberately raised his gun and fired both barrels, killing her instantly in the presence of a number of persons who were within a few feet of him. He then returned to his own buggy, placed the gun in the rear thereof, and walked down the street towards his father's home. On the way, he met a Mr. Denton and got in the buggy with him and drove to his father's, and while thus riding he met his sister and cousin and said to them in substance "You need not go to Elkton, I have shot and killed Aunt Bettye."

The Commonwealth finds a motive for this atrocious crime in the fact that by the death of Mrs. Sebree, appellant and his family would receive by inheritance quite a large estate. Mrs. Sebree was the widow of F. A. Sebree, an uncle of appellant, and a son of Col. E. G. Sebree. F. A. Sebree died in 1908, leaving by will his large estate in fee to his wife. The probate of the will was resisted in the county court by the heirs of Col. E. G.

Sebree, but in that court the will was probated. No appeal had been prosecuted from the probate of the will at the time of the homicide, but the statute allows five years in which to take the appeal—so that, there was yet ample time in which to prosecute it. It appears that Mrs. Sebree for some time before she was killed had been negotiating for the sale of all of the real estate devised to her by the will, and that as soon as the contestants, including appellant, learned of her purpose, they began to take steps to prosecute their appeal and thus prevent the sale. On the day of the homicide, they had arranged to perfect the appeal, and Mrs. Sebree was in Trenton on that day for the purpose of executing a conveyance to the land, which would have been completed except for her death before the appeal could be perfected; and, if the sale had been closed before the appeal was taken, the purpose of the appeal would in a large measure be defeated. It is the theory of the Commonwealth that the appellant was so incensed at his aunt because she was taking measures to keep the estate out of the possession of the contestants, that he was induced by this feeling of anger and greed to take her life.

On the trial, appellant did not testify, but many witnesses introduced in his behalf gave evidence tending to support his plea of insanity. The evidence, as is usual when the defense of insanity is relied on, took a wide range, and called forth every noticeable incident in the life of appellant from early boyhood to the day of the crime. His habits, conversation and conduct were minutely inquired into, and every peculiarity that he possessed, as well as eccentricity that he manifested, was the subject of investigation. A number of witnesses who had known him at different intervals were called for the prosecution and the defense, and gave evidence for and against him. Medical experts were introduced and testified in his behalf and for the Commonwealth, and gave their opinion as to his sanity on elaborately prepared hypothetical questions. Upon the facts and circumstances shown by the hypothetical question, the medical experts in his behalf said that he was a paranoiac; while the medical experts introduced by the Commonwealth when called on to express an opinion upon the same facts and circumstances said he was not.

In Wharton & Stilles Medical Jurisprudence, vol. 1, sec. 1020, paranoia is treated as a distinct and well recognized species of insanity, and is defined as—

"A form of insanity which is characterized by systematized delusions or by the tendency to form such delusions which present themselves in a particular manner of evolution."

Thus, it is said that:

"In the first stage, the patient passes through a period of disquietude, in which he begins to realize that he is out of harmony with his environments. He is uneasy and dissatisfied, he becomes introspective and subjects himself to analysis in an attempt to interpret his disorderly feelings and thoughts. The patient in full possession of his intelligence comes to realize that he is not in accord with others, and from this it is but a step for him to believe that others are not in accord with him. He is gradually, as it were, breaking up the ties of confidence and harmony upon which all rational society is founded. He becomes to himself something peculiar and apart from others. * * * * * *

"In the second stage, the patient passes on to the formations of delusions of suspicion and of persecution. * * * * The victim believes that he is the object of the evil designs of other persons; he is talked about and maligned; he is shunned; his plans are thwarted; he is unjustly dealt with; he is defrauded of his rights; he is tormented by unknown and unseen foes. In time he may fasten his suspicions upon some particular person or persons. He meditates plans of protection and then of resentment. He has now become the persecuted paranoiac, the most dangerous of all the insane. * * * * In the third stage, the patient undergoes what has been called the transformation of the personality. Either gradually or quite suddenly, he conceives delusions of grandeur. He who was persecuted and was reviled by man, rises superior to this adverse fate, and he becomes a person of exalted destiny."

It is also said by this authority that the second stage of the disease, or the persecutory form, is the most dangerous, and, it was the theory of the defense that appellant when he killed Mrs. Sebree was in the second stage of the disease and laboring under the delusion that she was the cause of his misfortunes. The medical experts in his behalf testified that his mental condition was such at the time of the homicide that he was not responsible for his acts. On the other hand, the expert testimony in be-

half of the Commonwealth was that the history of his life and antecedents did not furnish a basis upon which to rest the opinion or conclusion that appellant was a paranoiac or in the persecutory stage of that disease.

Without further elaboration of this feature of the case we will proceed to a consideration of the two principal reasons urged by counsel for a reversal—one relating to the evidence, the other to the instructions. Taking up first the question of evidence, the non-expert witnesses for the Commonwealth, after giving evidence of their knowledge of the habits, conduct and conversation of appellant formed from acquaintance and association with him, were asked in substance, "if, in their opinion, he was a person of sound or unsound mind," and the further question, "if, in their opinion, he had mind sufficient to know right from wrong;" and were permitted, over the objection of counsel for appellant, to answer these questions and say that in their opinion he was of sound mind and did have sufficient mental capacity to know right from wrong; while the witnesses introduced for the appellant after qualifying themselves to express an opinion in answer to these questions said that he was of unsound mind and did not have sufficient mental capacity to know right from wrong. It is not questioned that it was permissible for the witnesses to relate every incident and circumstance in the life of appellant, tending to show that he was of sound mind and that he did know right from wrong, but, it is said, that it was for the jury to find in their deliberations and say in their verdict from the facts thus testified to whether the accused was of sound or unsound mind, or did or did not have sufficient mental capacity to know right from wrong. And it is earnestly submitted that the questions objected to, and especially the second one, were incompetent and highly prejudicial for two reasons—first, because in answering these questions the witnesses were permitted to usurp the functions of the jury by giving an opinion upon the very point under investigation, and which the jury would be called upon to answer for themselves, and, second, because a paranoiac is not a maniac or lunatic in the usual or technical meaning of these terms, but is a person laboring under an infirmity that renders him only incapable of distinguishing between right and wrong in respect to the particular act or thing that is the subject of his persecutory delusion. And so it is said that the right and

wrong test should be confined to the time the crime was committed, and limited to that act. Yet another objection urged is that as paranoia is a peculiar affliction, no one but an expert is competent to express an opinion as to when the accused is or is not suffering from it. The question of the admissibility of opinion evidence in criminal cases as well as in other legal proceedings has come before the courts in innumerable cases and its consideration has engaged the attention of ·all the text-writers upon the subject of evidence, as will be seen by an examination of Greenleaf on Evidence, vol. 1, section 440; Wigmore on Evidence, vol. 3, section 1920; Elliott on Evidence, vol. 1, section 681, vol. 3, section 2290; 17 Cyc. page 138, 12 Am. & Eng. Ency. of Law, page 414; and the copious notes contained in these publications. But, in view of the well established rules in respect to opinion evidence prevailing in this State, it does not seem necessary to resort to text-books or decisions of other courts for precedent unless it be that the general principles we have so often announced do not embrace a case presenting the character of defense here made. Brown v. Commonwealth, 14 Bush, 398, is the leading Kentucky case on the subject of the competency of opinions by nonexperts in criminal prosecutions; and this case, which fully sets forth the grounds upon which the evidence is admitted has been followed in many others, among which we may mention Phelps v. Commonwealth, 17 Ky. L. R., 706; Wright v. Commonwealth, 24 Ky. L. R., 1838; Abbott v. Commonwealth, 107 Ky., 623. In the Abbott case · it is said:

"It is well settled in this State that persons who are· not experts, but by association and observation have had an opportunity to form an opinion as to the sanity of the · person, may testify to that opinion; giving, also, the facts· upon which the opinion is based, so that the jury may · judge for themselves what weight the opinion is entitled to."

From these authorities it will appear that the practice of permitting non-expert witnesses to express an opinion upon the question of the soundness or unsoundness of the mind of the accused is not an open question in this jurisdiction. But, conceding this, let us see if this character of opinion evidence is competent, when the witness is called upon to express an opinion as to whether the accused had mind sufficient to know right from wrong.

Without dealing in the refined or confusing distinctions of which the subject is capable, but treating it as a practical question in the administration of the criminal law, we are unable to make any distinction between the legal effect that should be attached to the competency of a question involving the soundness of mind of the accused, and a question involving his capacity to know right from wrong. If a person is of sound mind, as soundness of mind is commonly understood by non-expert witnesses, then he is capable of distinguishing between right and wrong and should be held accountable for his acts. On the other hand, if he is of unsound mind, he should not be held legally responsible for what he does. Therefore, when a non-expert witness is allowed to express an opinion that the accused is of sound mind, there seems no reason why he should not also be permitted to express an opinion that he knows right from wrong. One opinion does not require more knowledge than the other, nor is one more than the other a usurpation of the functions of the jury. The reasons that would justify the admission of this evidence in the one instance, would justify it in the other; and the practice that would reject one opinion would reject the other. The reason why both questions were asked is that the instruction, as we will presently point out, submitted to the jury in connection with an inquiry into the soundness of mind of the accused, his ability to distinguish between right and wrong; and, under our rule the jury were entitled to have the opinion of the witnesses upon both of these propositions. Of course, the jury is not obliged to, and it cannot be assumed that they will, accept the opinion of the witness as binding upon them, or give to it any more weight than they would to any other evidence. The facts the witness testifies to, and the individual opinion he expresses upon these facts, all go to the jury for their consideration.

Nor do we think the opinion of the witness should be confined to the act under investigation or limited to the victim. Unsoundness of mind and incapacity to distinguish between right and wrong was in this case, as it is in all others in which there is not a sudden or abrupt destruction or disturbance of the mental faculties the result of a gradual growth. The non-expert witnesses who testified were present during this growth and had opportunity to see and hear and know its development and its

effect. Their opinion was not based on one act or circumstance, but upon a long series of incidents, that when surveyed as a whole and weighed together left the impression upon their minds that the accused was or was not, as they looked at it, a responsible human being, and it is this character of opinion that the witness under our practice has the right to convey to the jury. Many of the witnesses introduced did not know or have opportunity to know what the state of mind of the accused was at the immediate time of the homicide, and to have deprived the witnesses of the right to express an opinion based on their knowledge of the accused acquired by association and observation up to the time they last had an opportunity to observe his acts and conduct, would have taken from their opinion much if not all the weight to which it was entitled. We think that when a non-expert witness qualifies himself to express an opinion, he may do so on the facts that have come under his notice, although he may not be able to express an opinion as to the condition of the mind of the accused at the moment he committed the crime charged.

This question was before the Court in Montgomery v. Commonwealth, 88 Ky., 509, in which it was said:

"Evidence of insanity, both before and after the criminal act, may be given to the jury for the purpose of enabling them to determine whether or not the same condition of mind existed at the time the act was committed; but no legal presumption arises from the proof of previous or after insanity, that the person was insane at the time he committed the criminal act; but the jury may draw such inferences of fact from these conditions as they may deem proper."

And again in Moore v. Commonwealth, 92 Ky., 630, in speaking upon the question of testimony to show the condition of mind of the accused before and after the act charged, the Court said:

"It is of course not sufficient to show that he was insane before or after, but if there be testimony, as there was in this instance, tending to show that his affection is of continuing or permanent character, then it is competent to prove his mental condition after as well as before the time when the act was done."

Nor must non-experts be excluded from testifying because paranoia is so peculiar a disease that no one but a medical expert who has made it a study can understand

or portray it. The record in this c ise, assuming that appellant was a paranoiac, exposes the fallacy of the theory advanced by counsel that paranoia is so singular an ailment that no person except he be versed in diseases of the mind is qualified to speak concerning it. A number of non-expert witnesses were introduced for the appellant, and they told of incident after incident in his life that indicated to them his want of mental capacity and his inability to distinguish right from wrong. His affliction made itself known to them in a hundred different ways that attracted their attention; and the occurrences testified to by them were not beyond the power of the non-expert to distinguish as manifestations of impaired intelligence. So that, taking appellant as he is exhibited in the record as an example of a paranoiac, we think that non-experts were equally as competent to give opinion evidence as non-experts would be in any other ordinary case of insanity, and that their evidence furnished to the jury a much clearer and more satisfactory picture of the condition of the appellant's mind than did the trained experts, who with much show of learning attempted to enlighten the jury upon the subject of paranoia and the train of evils that follow in its wake. In this connection we think it appropriate to repeat what was well said in Brown v. Commonwealth, supra—

"Those who have had anything like an extensive practice of law know how unreliable and worthless is the evidence of the average expert. Often the opinion is honestly formed and expressed to suit some pet thory that has no foundation in fact or experience, and some times it occurs that an overweening desire to place a rival practitioner in an unfavorable light before the jury and the local public, leads the expert to the expression of an opinion that is not the result of observation or experience, and does not correspond with the deduction that should be made from the facts."

Much complaint is made of the instructions upon the subject of insanity, which were copied from the Abbott case, and are as follows:

"1. Although the jury may believe from the evidence beyond a reasonable doubt, that the defendant shot and killed the deceased Elizabeth Sebree, yet if they further believe from the evidence that at the time of the killing the defendant was of unsound mind, then they should acquit him."

"2.  The law presumes every man sane until the contrary is shown by the evidence; and, before the defendant can be excused on the ground of insanity, the jury must believe from the evidence that the defendant was at the time of the killing without sufficient reason to know what he was doing, or had not sufficient reason to know right from wrong, or that, as the result of mental unsoundness, he had not then sufficient will power to govern his actions, by reason of some insane impulse which he could not resist or control."

The criticism of these instructions is that they are not applicable to the case, or, in other words, did not submit for the consideration of the jury the form or species of insanity upon which the defense was predicated. It is said that a paranoiac does know right from wrong in the sense that he knows it is unlawful to do a forbidden thing or to commit a crime, and yet, his mind is so diseased as that he may not know it is wrong to do the particular thing he is arraigned for committing. In short, the argument is that, although a person may have mind sufficient to know right from wrong, yet if he has not the capacity to appreciate the wrongfulness of the particular act he is about to do, he should not be held accountable to the law for its commission. It is further argued that as there are a great many well defined classifications of insanity, that the instructions should conform to the particular species of this disease that is relied on. Both legal and medical authorities recognize that there are varieties of insanity—the disease manifesting itself in different forms. But the prevailing legal rule, and the one adopted in this State, is that insanity, whatever form it may assume, to be an excuse for crime must be the result of mental unsoundness. What is known as moral insanity, defined to be—

"A morbid state of the affections and passions, or unsettling of the moral system, the mental faculties remaining normal and sound; an irresistible impulse to commit a criminal act co-existing with mental sanity." (Wharton & Stilles Medical Jurisprudence, vol. 1, sec. 195.) as an excuse for crime, found apparent recognition in the cases of Smith v. Commonwealth, 1 Duv., 224; Kriel v. Commonwealth, 5 Bush, 362; and Scott v. Commonwealth 4 Met., 227, decided many years ago, but never obtained a foothold in this State, nor has it in any other.  While the law does not desire or demand that incapables shall

be punished for violating its mandates, the frequency with, which this often mysterious and always alarming mental state known as insanity is put forward as an excuse for crime, makes it necessary for the protection of life that this defense should be as carefully guarded from abuse as its nature will permit. And, although medical writers are generally agreed that there is a well defined disease called moral insanity, as distinguished from mental insanity as the latter is usually understood, the doctrine of moral insanity as a protection against punishment has been repudiated by all courts as dangerous to the safety of society. Wharton's Criminal Law, Vol. 1, Sec. 46. Under our practice, in every case where the defense of insanity is made, the accused is allowed the widest latitude in bringing before the jury the peculiarities of the particular affection he is suffering with, whatever its technical name may be; but, when this is done, he must submit to the inexorable test that it is only unsoundness of mind as a result of mental disease that will save him from the consequences of his act. McCarthy v. Commonwealth, 114 Ky., 620. If appellant was a paranoiac, and under the coercive influence of an insane delusion that he could not resist, he was not entitled to an acquittal unless the jury believed that this impelling power was the result of mental disease; and this being so the very point in his defense was covered by that part of the instruction telling the jury that they should acquit him if "as a result of mental unsoundness he did not then have sufficient will power to govern his actions by reason of some insane impulse, which he could not resist or control." From a careful examination of the record, we are satisfied that the test of insanity that would authorize the discharge of appellant was properly applied in the instructions.

Another objection urged to the instructions is that they did not define the words "malice aforethought." It is usual and proper in cases in which the facts authorize an instruction upon the subject of capital punishment and degrees of the offense to define in the instructions the words "malice aforethought." Jolly v. Commonwealth, 110 Ky., 190. But the failure to define these words is not always prejudicial error. Hathaway v. Commonwealth, 26 Ky. Law Rep., 630. In this case, if the appellant was not insane, there can not be any doubt that his act was malicious in the extreme, and it would be

trifling with justice to order a new trial because of the omission of words, the insertion of which could not under any circumstances that we can conceive of, have been helpful to appellant. He was either entitled to an acquittal on the ground of insanity, or he was guilty of murder. There could not be any degree of his offense. If the evidence in any given case was such that the jury might in their discretion believe that the accused was guilty of a lower degree of the offense than that charged in the indictment, as, for example, voluntary manslaughter when the indictment was for murder, and there were facts and circumstances from which the jury might conclude that the act under investigation was not malicious, it would probably be prejudicial error to fail to define the words "malice aforethought," because in such a case the jury in the absence of a definition might not be able to distinguish between the facts necessary to constitute murder and the facts necessary to constitute voluntary manslaughter. But, where the defendant is guilty of murder, or not guilty at all, the failure to define the meaning of these words will not of itself be sufficient to justify a reversal.

Upon the whole case, we are satisfied that the defendant had a fair trial, and the judgment is affirmed.