## Graham v. Commonwealth.

(Decided April 27, 1915.)

## Appeal from Hardin Circuit Court.

1. Courts—Order Calling Special Term—When Not Defective.—An order calling a special term of circuit court entered at the last day of the regular term was not defective for failing to give the style of the case to be tried, nor for failing to state that the special term was necessary to transact the business of the court.

2. Courts—Special Terms of.—In ordering a special term, the circuit judge does not act as a court of limited or special jurisdiction.

3. Venue—Application for Change of—Refusal.—The court did not err in refusing to grant a change of venue when the petition therefor was not accompanied nor corroborated by the affidavits of as many as two credible persons. Neither was there error in refusing to grant a continuance or further time in the absence of a showing that any witness or testimony could be had at a later date that was not available at the time the request for continuance was made.

4. Homicide—Evidence.—Where accused was guilty of another homicide committed a few days before, and at the time he killed the sheriff, attempting to make the arrest, and for which offense he was being tried, he was a fugitive and endeavoring to escape arrest for the first offense, evidence of the first homicide was competent as tending to show his motive for killing the officer, instead of submitting to arrest, but was competent for that purpose only, and the court should and did so caution the jury.

5. Homicide—Threats—Evidence.—For the same reason, it was competent to admit evidence of previous threats made by the accused against any officer of the law who might attempt to arrest him.

6. Homicide—Evidence.—It was not error to permit evidence to go to the jury of a conversation between the sheriff and the stepmother of accused, in which the sheriff's official capacity and purpose was disclosed, when there was evidence to show that the accused heard the conversation. The court properly submitted to the jury the question whether the accused knew the facts disclosed in the conversation.

7. Criminal Law—Trial—Instructions.—The instructions conformed substantially to those heretofore approved by this court in trials for similar offenses, and all of appellant's defenses were submitted to the jury. Their great length because of this fact is not a proper subject of complaint from him.

IRWIN & IRWIN for appellant.

JAMES GARNETT, Attorney General; HENRY DeHAVEN MOORMAN, Commonwealth Attorney; R. A. BUCKLES, County Attorney, and H. L. JAMES for appellee.

OPINION OF THE COURT BY JUDGE NUNN—Affirming.

The appellant was tried at a special term of the Hardin Circuit Court for the murder of Robert T. McMurtry, sheriff of that county. The jury returned a verdict finding him guilty and fixing his punishment at death. On appeal it is insisted that the conviction was erroneous because the lower court was without authority to hold a special term; that the order calling the term was defective; that the court should have granted his motions for change of venue and continuance; that incompetent evidence was admitted, and erroneous instructions given.

A statement of facts is necessary for a proper consideration of the rulings complained of.

Some time after dark on December 10th, 1914, the town marshal of Upton, in Hardin County, was requested to arrest Turner Graham, Jr., and Grover Chism, on the representation that they were then guilty of some unlawful conduct. The marshal deputized James Wood, and others, to assist in making the arrest. When the officers reached the railroad station, where they expected to find the guilty parties, there was no sign of disorder. Wood knew Turner Graham, Jr., and, when he spied him, leveled his shotgun on him with the command to hold up his hands. Another of the deputies did the same thing. After this command had been repeated three times, Graham drew his pistol and shot Wood three times, killing him, and shot the town marshal once, inflicting a serious but not fatal wound. Graham at once fled from the scene and remained in the woods that night, the next day and the next night. About six o'clock on the morning of the 12th he reached his father's house, several miles from Elizabethtown. Graham admits being at Upton on that night, but says he had nothing to do with Wood's death; in fact, did not know of it until early on the morning of the 12th, when he was making his way along the road to his father's house. He met a stranger, a man he never saw before or since, and this man inquired if he had heard of the trouble at Upton. When Graham said that he had not, the stranger told him that James Wood had been killed, and that a mob was scouring the country looking for Turner Graham, Jr., the man accused of the murder. Graham admits that he was hiding in the woods all the time after he left Upton. Reaching home, he had breakfast, and then went up stairs armed

with a shotgun and pistol. He says he was concealing his presence there in order to escape the mob, which the stranger told him about. He remained in the upstairs room until about noon, when he shot McMurtry, who, as sheriff, was attempting to arrest him for the murder of Wood. Graham admits that he shot and killed McMurtry, but at the time believed he was a member of the mob which he feared was coming after him. He admits a personal acquaintance with McMurtry; that is, he would know him at sight, and knew that McMurtry was sheriff, but did not know McMurtry was the man he was shooting at. He also admits that there was but one window in the room where he was armed and waiting in apprehension of the mob, and that this window had an outlook for 200 yards on the road which McMurtry and his posse used in approaching the house. Immediately after Wood was killed the county judge issued a warrant for the arrest of Graham on the charge of murder, and placed it in the hands of McMurtry as sheriff, and from that time until he was shot McMurtry had one or more posses in different parts of the county searching for Graham. There is no dispute about the issual of the warrant and of its coming to McMurtry's hands. News came to McMurtry on the morning of the 12th that Graham was concealing himself at the Graham home. With a posse of five or six men he reached there about noon. McMurtry with two of the men approached the place from the road, and in view of the upstairs window already referred to. The other members of the posse approached at the same time from opposite directions. McMurtry and his deputy, Fife, left their shotguns leaning against the yard fence, and were met at the front door by Mrs. Graham, stepmother of Turner Graham. McMurtry told her he was looking for Turner Graham, who was wanted on the charge of murder. She replied that Graham was not there and had not been at her house for several days. McMurtry told her he would have to search the house anyhow, and she told him to go ahead. This conversation occurred just inside the house near the front door, and within three feet of the bottom of a stairway leading to the second floor, where Graham was concealing himself. At the time of the conversation he was near the head of the stairway. This stairway was boxed up with light plank, and there was a plain door across it about three flights from the lower floor, and just in front of

a landing on the stairway angle. There is evidence that
Turner Graham could hear what was said in an ordinary
toned conversation down stairs, and tests afterwards
demonstrated the fact. Graham admits hearing the con-
versation, but says he could not understand what was
said, nor could he identify the parties talking. McMur-
try and Fife, after making some search on the lower
floor, opened the stairway door and started through it
together, McMurtry slightly in advance. This put them
on the landing at the stairway angle, and, of course, in
range of anyone at the head of the stairway, and, from
which point, without a word from anyone, Graham fired
a shotgun, the whole charge entering McMurtry's face
and neck, tearing away his tongue and lower jaw. The
other deputies answered Fife's call for assistance, and
the wounded man was carried out doors. Orders were
given to shoot into the upstairs room and others talked
of dynamiting or burning the house, but when the first
shot passed through the room Graham offered to sur-
render, and, on assurance of protection, came down and
submitted to the officers. He was carried to Elizabeth-
town at once, and placed in jail. The wounded man was
also taken to his home at Elizabethtown, but he died
about midnight.

The circuit court was then in session, but it was the
last day of the term. On that day, when it became known
that the sheriff had been mortally wounded in his at-
tempt to arrest Graham for the murder of Wood, the
judge of the circuit court called a special term of court
to convene December 17th, for the purpose of investi-
gating these crimes and trying any person that might be
indicted. Attorneys were appointed to represent him
soon after he was placed in jail, and after a consultation
he consented to a postponement of his examining trial,
and that night he was carried to Louisville and placed
in jail, where he was kept until the 17th, the date of the
special term. On the 16th these attorneys were regularly
employed to represent him, and on the 17th, the first day
of the special term, the grand jury indicted him for the
murder of McMurtry, and his trial was set for hearing
on the 21st. After his indictment on the 17th, he was re-
conveyed to Louisville, and, at his request, was kept
there until the day of trial. He then filed a verified pe-
tition for change of venue and at the same time filed an
affidavit for continuance. These motions being over-

ruled, Graham was put on trial, with the result already stated.

The first error assigned is that the court called and held a special term without authority of law, because, as he says, it does not appear that a special term was necessary to transact the business of the court, and the order calling it did not show that an emergency existed; it failed also to give the style of any cause to be tried. The only authority for calling a special term of circuit court is Section 964 of the Kentucky Statutes. That part of the section which applies to this question is as follows:

"Whenever it is necessary to transact the business, a special term may be held in any county, either by an order entered of record at the last preceding regular term in the county or by notice signed by the judge and posted at the courthouse door of the county for ten days before the special term is held. The order or notice shall specify the day when the special term is to commence, and shall give the style of each case to be tried * * * and no other case shall be tried * * * unless by agreement of parties. Grand juries shall be summoned and criminal and penal cases shall be heard at but three terms in each year in any county, to be fixed by order of court, unless in emergency the court may otherwise direct; and grand or petit juries may be summoned for any special term by direction of the judge."

As we have already pointed out, the special term was called by order entered of record on the day McMurtry was shot, and which was the last day of the regular term. We copy from the order:

"It appearing to the satisfaction of the court that James Wood was killed on the night of December 10th, 1914, in Hardin County, Kentucky, and that warrants have been issued by the Hardin County Quarterly Court for Turner Graham, Jr., Grover Chism, charging them with murder for said killing, and it further appearing that Robert McMurtry, the sheriff of Hardin County, was this day shot and wounded by Turner Graham, Jr., while said McMurtry was seeking to arrest him upon said charge, and that a warrant has been issued, charging said Turner Graham, Jr., with wilfully and maliciously shooting said McMurtry with a shotgun, a deadly weapon, with the intention to kill him, and further charging Mary E. Graham, Turner Graham, Sr., Grover Chism, Dude Leek, and Roy Leek, with aiding, abetting, en-

couraging, and assisting said Turner Graham, Jr., to so wilfully and maliciously shoot said Robert McMurtry, and that Turner Graham, Jr., and Turner Graham, Sr., Mary E. Graham, and Roy Leek are now in the Hardin County jail, charged with the commission of said crime in Hardin County, Kentucky, and it further appearing to the court that it is important that said matters be investigated and tried as speedily as possible to preserve the good order of the community and enforce the law; now, by reason thereof, an emergency exists, demanding an immediate hearing of said matters, and it is, therefore, ordered that a special term of the Hardin Circuit Court shall convene on Thursday, December 17th, 1914, and continue in session two weeks or so long as is necessary for a proper investigation of the facts by the grand jury and trial by a petit jury upon any charges or indictments presented or returned against any or all of said defendants for said alleged crimes, acts or offenses, or any resulting from said shooting.''

The order then gave direction to the clerk and sheriff with reference to jury lists, and summoning the grand jury for the special term.

We find that this court has already passed upon all the questions raised on the sufficiency of this order and the validity of the special term. For instance, appellant insists that when the order failed to show that a special term was necessary to transact the business of the court it omitted a jurisdictional fact. If the circuit judge in calling a special term acted as a court of limited jurisdiction it would follow that the record must show the existence of the facts necessary to give jurisdiction. But the court and judge in such matters do not act as a court of limited jurisdiction. This question was passed upon in the case of Banks v. Commonwealth, 145 Ky., 800:

''Nor is counsel correct in asserting that the circuit court, or the judge thereof, in calling a special term is a court of limited jurisdiction, and, therefore, when it acts the record must show the facts necessary to confer jurisdiction—that is, the reason why it is necessary to call the term. It is true that when courts of limited jurisdiction act, the record must show the existence of the jurisdictional fact. Freeman on Judgments, Volume 1, Section 123; Jacob's Admr. v. L. & N. R. R. Co., 10 Bush, 263; Taylor v. Moore, 112 Ky., 330. But the circuit court is not a court of limited or special jurisdiction. It is a

court of general jurisdiction, and the presumption of validity follows all orders and judgments made and entered by it, except in cases in which the statute has expressly pointed out that certain facts must appear in the record before it can have jurisdiction, which it does not do in respect to the matter we are considering. In cases in which the statute does not expressly point out the jurisdictional facts necessary to confer jurisdiction the party assailing the verity of its orders and judgments must affirmatively show that it did not have jurisdiction. It is not necessary that the jurisdictional facts should appear in the record. Freeman on Judgments, Section 122; Jacob v. L. & N. R. R. Co., *supra;* Crown Real Estate Co. v. Rogers, 132 Ky., 790.''

The calling of a special term lies within the discretion of the judge, and he acts whenever in his opinion it is necessary to transact the business of the court, and he will order grand and petit juries to serve at the special term whenever, in his opinion, an emergency exists. The law does not define an emergency, nor does it name the facts necessary to constitute it. Neither does it say what state of facts, as affecting the docket, will constitute a necessity for a special term. Clearly, these are matters left to the discretion of the judge, and unless it be shown that there has been an abuse of discretion this court will not interfere. The question has been frequently passed upon, but nowhere is the rule better stated than in the Banks case, *supra:*

''The statute leaves to the circuit judge or the judge holding the regular term the right to order a special term whenever it is necessary to transact the business of the court.

''There is no limitation imposed by the statute upon the authority conferred. Of course the Legislature could not make specific provisions for the calling of special terms, because the legislative department could not know in advance what the condition of the business in any given district might be or whether it would be necessary to have special terms or not; and so, as the power to order special terms must be lodged in some person or tribunal, it is apparent that the judge of the court is the most appropriate person to be vested with this authority. In the conduct of the business of the district and court the circuit judge is presumed to be and is better advised than any other person as to the neces-

sity for holding special terms to transact with expedition the business of the court, and it would be a most extraordinary state of case in which we would feel inclined to interfere with the judgment of the judge as to the necessity for calling a special term. Blimm v. Com., 7 Bush, 320; Huber v. Armstrong, 7 Bush, 590; White v. Commonwealth, 120 Ky., 178; Penman v. Commonwealth, 141 Ky., 660.''

In Powers v. Commonwealth, 29 Ky. L. R., 277, the court said with reference to this contention:

''Under the language of the statute it was in the province of the court, exercising a reasonable judgment, to determine whether an emergency existed, which authorized the trial of the case at a time other than a regular term at which criminal cases were directed by law to be tried. This court should not interfere with the action of the lower court, in a matter like this, unless it be made to appear that the court abused its discretion and which operated to the prejudice of the substantial rights of the person on trial, and this is not made to appear in this case.''

But appellant says that the statute requires that the order calling a special term shall give the style of each case to be tried, and that no other case shall be tried. But in construing this section, which further provides for the summoning of a grand and petit jury, this court, in the case of Penman v. Commonwealth, 141 Ky., 660, decided the question adversely to appellant's contention. Penman was indicted, tried and convicted at a special term. The court said:

''The statute provides that 'whenever it is necessary to transact the business, a special term may be held in any county,' and also imposes upon the judge calling a special term the duty of specifying in the notice or order 'the style of each case to be tried or in which any motion, order or judgment may be made or entered.' It also confers upon the judge authority to summon a grand jury at a special term to inquire into any violation of the criminal or penal law. And so, the judge of the district had ample authority to empanel the grand jury to investigate the charge against the appellant, and to try him for the crime charged in the indictment. It is true that when this special term was called, there was no prosecution pending against the appellant. But the fact that there is no prosecution pending when the

special term is called does not deprive the judge of the authority to call a special term and empanel a grand jury at such term, or to try such cases, or to try thereat any person that the grand jury may indict.''

Speaking with reference to the notice required in calling a special term, which applies as well to an order made at a regular term, the court says in that case:

''The requirement that the notice calling the special term shall designate the business to be disposed of was incorporated only for the purpose of informing persons having cases pending in court that they would be taken up and disposed of at the special term. Except for this notice, litigants and attorneys might not be prepared to go into the trial of cases at the special term. But this provision does not limit the court to the trial of pending prosecutions. Any criminal case that can be heard and disposed of at a regular term can be heard and disposed of at a special term. The court has the same power and authority at a special term to empanel a grand jury and dispose of indictments returned by it, as it has to empanel a grand jury at a regular term and dispose of the indictments returned by it at such term. It was, however, eminently proper for the court to give notice of this special term to appellant, and the fact that his case would then be taken up, so that he might have opportunity to prepare a defense, although the failure to give such notice would not in the absence of any other reason constitute error.''

The question was again presented in Ellis v. Commonwealth, 146 Ky., 715, where appellant was indicted at a special term under a call which directed the empaneling of a grand and petit jury, ''for the investigation of violations of the criminal and penal laws of the State, and should said grand jury return indictments against James Ellis and Fount Helton, or either of them, upon the charge of shooting and killing A. J. Beatty and W. F. Heath, or either of them, said prosecutions shall stand for trial, and motions, orders and judgment may be made and entered in either or both of said cases.'' In response to the motion to quash the indictment the court said:

''Upon this record it must be conclusively presumed that there was a necessity for calling the special term, and this order gave the court at the special term full jurisdiction to take any action that could be taken at a

regular term of the court in reference to the indictment and trial of violators of the penal and criminal laws of the Commonwealth, and, therefore, the court correctly overruled the motion of counsel for appellant to quash the indictment."

But we think the facts stated in the call for the special term of court in this case sustain the view of the lower court that there was an emergency, and a necessity for a special term. The appellant and Grover Chism were under arrest for the murder of James Wood, a deputy town marshal, and the appellant was under arrest charged with the murder of McMurtry, the sheriff of the county, and five others were arrested and held as aiders and abettors in that murder. The circuit judge, better than anybody else, knew the condition of his docket, and the necessity for a speedy investigation and trial of the accused, and it was quite unnecessary to set forth further details.

When the case was called for trial on December 21st, the appellant filed his verified petition for a change of venue, and moved the court to continue the case; that is, grant further time in which to procure the affidavits which the statute requires shall accompany petitions for a change of venue. The court overruled the motion for a change of venue, and refused to grant a continuance, or further time. The appellant insists that this was error. In appellant's affidavits in support of these motions it appears that he was arrested on December 12th, the same day that McMurtry was killed, and confined in the county jail. Great excitement prevailed, and, as a consequence, the authorities deemed it wise to remove him from the county for safe keeping, and, in a few hours, he was taken to Louisville, and there placed in jail. On December 18th, he was brought back to Elizabethtown. This was his first opportunity to consult with attorneys about his defense, and then only for a brief period. He says that he knew the state of public opinion in Hardin County, and that "such an odium exists against him in this county that no one is willing, so far as he has been able to learn, to make for him the affidavits requisite for his motion for a change of venue. But if given further time he believes he can get such affidavits." After stating that he has no friends who would look after these matters for him, the affidavit concludes with the statement:

"That because of such confinement, and short time since the alleged offense was committed he has been unable to properly prepare his defense and is not ready for trial."

The following uncontradicted facts appear in the record: Attorneys were appointed by the county judge to represent the accused the day he was arrested and confined in the Elizabethtown jail. These attorneys conferred with him that day, but the only subject discussed was his removal to Louisville and waiver of examining trial. On December 16th these attorneys were employed to defend Graham. The names of three or four persons were given to the attorneys as probable witnesses in support of the motion for a change of venue, but they refused to make the affidavits. In the opinion of the circuit judge there was not such a hostile public feeling as to justify a change of venue. There is nothing in the affidavit or the record anywhere to show the name of any person who entertained a contrary view, or who would make an affidavit for a change of venue, or who could give testimony to anything in support of appellant's defense. It is apparent that every person who knew anything about the case was present and testified. The appellant is the only person who testified that there was such a hostile feeling against him in Hardin County as to render a fair trial unlikely. The lower court in overruling the motion made reference to many facts which justified his conclusion that appellant could have a fair trial then and there. In effect, appellant's motion was for further time in which to secure the necessary affidavits to support the motion for a change of venue, coupled with the argument that nine days is not sufficient time in which to prepare one's defense to a murder charge. Criminal procedure is regulated by the Code and Statutes and the sound discretion of the trial judge. Unless the law regulating trials has been violated to the prejudice of appellant, or unless the lower court has been guilty of an abuse of discretion, this court will not interfere. The Constitution (Section 11) stipulates that the accused shall have a speedy public trial by an impartial jury of the vicinage. But the General Assembly is given power to provide by law for a change of venue. Section 1110 of the Kentucky Statutes is the law enacted pursuant to that authority. That law requires defendant's petition for a change to be accompanied and corrobo-

rated by the affidavits of at least two credible persons. Appellant does not produce the affidavit of even one person in support of his petition, and, therefore, the constitutional requirement for a trial in the vicinage applies. It follows that the trial judge did not err in refusing to change the venue to another county. The policy of the law is to have speedy public trials and the constitution so provides. By this it is not meant that any legal right of the accused is to be prejudiced, or that he should be denied reasonable facilities for the preparation of his defense. Where the code and statutory requirements have been complied with, and the accused convicted, and on appeal he is contending that he has not had reasonable opportunity or facility to prepare or make his defense, then it is at least incumbent upon him to show that his case has been prejudiced, and that if he had been given further opportunity, or, as in this case, longer time, he could have produced witnesses who would give testimony which would aid materially in his defense. In other words, before this court should reverse a judgment of conviction, it must appear that defendant's substantial rights have been prejudiced by reason of some error of the lower court. As we have already seen, there was no error in refusing the motion for a change of venue. Under a similar state of facts, this court said, in the case of Fitzgerald v. Commonwealth, 30 Ky. L. R., 349:

"The only power a court has to grant a change of venue is conferred by the statute, and as the appellant failed to comply with the provisions of Sec. 1096, which prescribes the form of affidavits which must accompany the petition, the court correctly overruled his application for the change. This resulted in a hardship to the appellant, but the court was without discretion in the matter, the Legislature having enacted the form of procedure to be followed."

Neither do we believe the court erred in refusing a continuance, because there is nothing in appellant's affidavit nor in the record to show that he could have produced a single witness or a shred of testimony other or different from that offered at the trial. In Quinn v. Commonwealth, 23 Ky. L. R., 1302, the court had under consideration these very questions, and what was there said seems conclusive:

"We are of opinion that there was no error in refus-

ing a continuance. The affidavit filed by appellant in this case is similar to the one filed in the Banks case, 20 Ky. Law Rep., 1037, marked to be reported, without the supporting statement of counsel, as was the case in the Banks case. In that case the court said: 'It is true that the affidavits for continuance tended to show that defendant had been in jail in a distant part of the State for a considerable time prior to the trial, and if he had been able to show from his affidavit that further time would have, with reasonable certainty, enabled him to procure material evidence, to support his defence, a postponement of the trial should have been adjudged; but, inasmuch as his affidavit failed to show even a strong probability that a postponement would enable him to procure material evidence to support his defense, we are not inclined to the opinion that the refusal of the court to grant a continuance constitutes reversible error.' "

Further in the opinion the court refers to the case of Smith v. Commonwealth, 19 Ky. L. R., 1074, and quoted with approval the following from that opinion:

"We know of no rule of law that would authorize the court to continue a case on account of prejudice and excitement against the accused. This must be left with the trial judge, and this court could not and would not interfere unless there was a palpable abuse of discretion, and this abuse of discretion should appear by other evidence than the affidavit of the accused. The trial judge being present, must be presumed to know the surroundings and the state of public feeling to some extent at least."

The case of Penman v. Commonwealth, 141 Ky., 660, is in point:

"The affidavit for a continuance, set out the date the crime was committed, and the time of appellant's arrest, and removal to the Lebanon jail, and from thence to the Jefferson County jail. And further set out that: 'He has never been given an examining trial on this charge, and has had no opportunity of knowing what character of testimony will be offered against him; that he has had no opportunity until this morning to confer with counsel who have been employed to defend him, and that on account of his incarceration in jail at Louisville, and on account of the distance from his home and his financial condition he has been unable to properly prepare his case. He states that his friends and relatives

only yesterday employed his counsel, and that if given until the next regular term of this court he will be able to establish his innocence of this charge.' "

The opinion continues with this reference to his motion for continuance:

"But, neither the motion for a continuance, nor other part of the record, discloses any fact that would even tend to show he was not as well prepared for trial at this term as he would have been at a subsequent term. Nowhere do we find the name of any witness that was needed in his defense, or mention of evidence that was not introduced in his behalf. His counsel are lawyers of ability and experience, and we feel safe in saying that if there was any reason why appellant was not ready for trial at the special term, or if he could have introduced in his behalf any witness at a succeeding term that could not be procured at the special term, or if he could have impeached or discredited or contradicted at a subsequent term the testimony of the witnesses for the Commonwealth, or any of them, or have in any manner shown—other than by his own testimony—that he was innocent, that these attorneys who had from September 27th to September 30th to advise and consult with their client before the trial commenced, would have made it known either in the affidavit for a continuance or during the trial or in the motion for a new trial. And the fact that the record does not furnish any reason for a continuance, except that stated in the affidavit, convinces us that no other reason could be assigned. This being so, we are well satisfied that the court did not err in refusing to grant a continuance. Under circumstances like those existing in this case, the sole purpose of granting a continuance would be to give the accused an opportunity to present some evidence in his behalf that he could not obtain or introduce if required to try at the term the motion for a continuance was made, or to enable him to employ and advise with counsel needed in his defense whose employment or advice he could not secure unless a continuance was granted, or to give him an opportunity to discredit, impeach or contradict the testimony that might be offered for the prosecution. Accepting these propositions as a test of appellant's right to a continuance, he failed in every particular to show if the continuance had been granted he could have improved his situation."

The court permitted evidence to go to the jury, over appellant's objection, concerning the murder of James Wood at Upton two days before. Appellant insists that the evidence failed to show that appellant was guilty of the murder of Wood, or guilty of any crime, and for that reason he contends that it was prejudicial error to admit it. The testimony was to the effect that Murray, the town marshal of Upton, was requested to arrest the appellant and Grover Chism; he deputized Wood and others to assist him in making the arrest; while attempting to make the arrest appellant killed Wood, in the manner already related. The court cautioned the jury that this evidence was received on the question of appellant's motive for killing McMurtry, and could only be considered for that purpose. The Commonwealth attempted to show the reason for the arrest, but, on appellant's objection, proof of this character was rejected. Having objected to that evidence, he ought not now to complain that the record shows no reason for the attempted arrest at Upton. Witness Francis, the telegraph operator at Upton, and witness Paynter, identified Turner Graham as the man who killed Wood. As explained by the court to the jury, the purpose, and the only purpose, of this evidence was to show appellant's motive or attitude toward the sheriff, McMurtry, at the time he killed him. If appellant was a fugitive from justice, and attempting to escape, it tended to show his motive for killing the sheriff instead of submitting to arrest. Whether he was guilty or innocent of the first homicide—when Wood was killed—was not material to this question, and the caution to the jury was to this effect. The essential facts were the homicide and the charge against Graham as the slayer, his knowledge of the charge, and his efforts to elude the officers and escape arrest. As stated in the case of Bishop v. Commonwealth, 109 Ky., 566:

"It is, perhaps, unfortunate for the appellant that the first homicide was so interwoven with the second as to furnish a motive for it, but, as it did tend to show motive, it was for that purpose, and that purpose only, and the jury were expressly instructed that it was for that purpose, and that purpose only, admissible."

This question which appellant raises as to evidence of the first homicide was considered and decided by this court in the Bishop case, *supra*, and the ruling of the

lower court was based upon that opinion. We quote again from pages 565 and 566:

"It was competent to establish any fact which tended to show motive on the part of the accused, and to make plain to the jury the relations which existed between the accused and the officer at the time the homicide was committed. It was not merely competent to show that a man had been killed, and that appellant was accused of killing him, in order to justify the officer's arrest; but it was equally competent to show that appellant actually killed the man, and was fleeing from the scene of the homicide at the time of his arrest by the officer, in order to establish the motive of desire of escape, upon the existence of which motive the jury evidently based their verdict. In establishing the fact of the killing it was impossible to avoid proving some of the details. We are unable to see how this could have been avoided, and we cannot see that any details unnecessary in making proof of the killing at the 'Lagoon' were permitted by the court to be lugged into the trial of the second homicide. Of course, it was essential that the jury be told that the killing at the 'Lagoon' was not evidence to establish guilt under the indictment upon which appellant was being tried, but was only evidence to show why appellant was on the car, and to establish motive for the homicide. This the trial judge repeatedly, and with exemplary care, explained to the jury, and again reiterated in a special instruction given with the instructions upon the law of the case."

We have already referred to the conversation at the foot of the stairway between Mrs. Graham and McMurtry, in which McMurtry made it known that he was seeking to arrest the appellant. If the appellant did not hear the conversation and did not know it was an officer, with authority to arrest him, his ignorance in this regard might serve to reduce the offense from murder to manslaughter. Appellant argues that unless the evidence showed that appellant did hear the conversation, it was incompetent, and that the court, in admitting the evidence, ruled that appellant did hear the conversation. We believe counsel for appellant is mistaken in his position. Witnesses for the Commonwealth testified that appellant could hear the conversation and afterwards made a test in the same tone of voice, which verified their statements. Appellant himself admits hearing the

conversation, but claims that he did not recognize the officer or understand the words spoken. Under the circumstances, we think this was a question for the jury, and the instructions of the court on the proposition of murder and manslaughter submitted to the jury the question as to whether or not appellant did know at the time that the man he killed was an officer seeking to arrest him.

Two witnesses testified that in September, 1914, at Cecilian, they heard appellant say he "had just got out of jail, been in a short time, and the first officer that attempted to arrest him he intended to burn him up and take the consequences." Appellant argues that this evidence was incompetent; but we think the court properly admitted it, because it tended to show appellant's motive in resisting arrest, and what has already been said with reference to the evidence concerning the killing of Wood at Upton is equally applicable to this proposition.

A similar question was raised in the case of Quinn v. Commonwealth, 23 Ky. L. R., 1302. Quinn, while resisting arrest, killed the officer, and a short time before the killing he said: "I don't propose to go there (workhouse) again. I will either kill or be killed before I will serve another sentence, for they just mistreat me and they don't give me enough to eat, and I am not going there any more." To another person he said: "No, sir, I am not, and they had better let me alone or I will fix them." In answer to objection to this testimony the court said:

"There was no error in admitting testimony. The threats that appellant made that he would kill or be killed before he would go to the workhouse were competent. If true, they showed a fixed purpose to resist arrest, even to the extent of death, which the proof shows he did do."

Appellant in general terms criticizes the instructions. It is said that they are confusing and misleading, and fail to properly present the law of the case. His chief reason for these conclusions is their great length. It is true the instructions are numerous and lengthy, but that is the result of the court's effort to present to the jury every phase of appellant's defense. It is not necessary to copy them here. As to the rights and duties of an arresting officer and the accused, the instructions are

patterned after those copied and approved in the case of Fleetwood v. Commonwealth, 80 Ky., 1. In the event the jury should find that McMurtry was not the sheriff or was not in the discharge of his duty—in other words, if the jury should find that no question of official character was involved—then they were instructed as to murder, manslaughter and self-defense, after the instructions given in the case of Ball v. Commonwealth, 125 Ky., 601.

Perceiving no prejudicial error, the judgment of the lower court is affirmed.