## McDonald v. City of Lexington.

(Decided March 23, 1934.)

S. S. YANTIS for appellant.

J. PELHAM JOHNSTON and CHESTER D. ADAMS for appellee.

OPINION OF THE COURT BY JUDGE DIETZMAN—Affirming in part and reversing in part.

On the 11th day of September, 1933, the board of

commissioners of the city of Lexington enacted an ordinance providing for the submission to the qualified voters of that municipality at the regular election to be held on November 7, 1933, the question whether the city should incur an indebtedness of $1,312,500, and should issue and sell its 4 per cent. bonds in said sum therefor, the money thus to be realized to be used for the purpose of the construction, installation, improvement, and repair, with the aid of the federal government under the provisions of the National Industrial Recovery Act (48 Stat. 195), of certain public works, to wit, a storm water sewer system, a sanitary sewer system, and a sewage disposal plant, a new public health center, a community center for white citizens, a community center for colored citizens, and a new city jail, the bonds and interest thereon to be paid by the levy of taxes of the city each year from 1934 to 1963. The ordinance provided that the question to be submitted to the qualified electors as to whether the indebtedness should be incurred and the bonds issued therefor or not should read as follows:

"Are you in favor of authorizing the City of Lexington to incur an indebtedness of $1,312,500.00 and issue its bonds therefor, payable at the rate of $52,500.00 each year, for a period of 25 years, beginning in the year 1939 and ending in the year 1963, and bearing interest at the rate of 4 per cent. per annum, payable semi-annually, until paid, and all to be paid, both principal and interest, out of taxes to be levied by the city annually during the period of 30 years beginning with the year 1934 and ending with the year 1963, on all real and personal property subject to taxation within the city, in order to provide funds for the construction, installation, equipment, improvement and repair of the following public works for the city, viz.:"

(here follows the list of public improvements to be constructed out of the money raised by the bonds).

The ordinance further provided that if the proposed indebtedness should be authorized by the requisite vote of the qualified electors, and if the indebtedness therein authorized be incurred and the bonds issued, "the amount of money necessary to be raised by taxation each year for the first 5 years after their issue, in order to meet the interest on same, shall be $52,500.00, and the amount of money necessary to be raised by taxation

the 6th year in order to meet the interest on said bonds and to pay the $52,500.00 of principal of same that will then mature, will be $105,000.00, and the amount of money necessary to be raised by taxation anually thereafter until the maturity of the last maturing of said bonds, for the purpose of meeting the amounts of said bonds that will mature during the year and the interest on all unpaid bonds, shall be progressively, $2,100.00 less than the amount required for the same purpose the year before.'' Pursuant to the ordinance, the question of incurring the indebtedness and issuing the bonds was submitted to the qualified voters of the city of Lexington at the election held on November 7, 1933, in the form prescribed by the ordinance. The requisite number of electors voted in favor of incurring said indebtedness and issuing said bonds. Pursuant to this vote, the board of commissioners of the city of Lexington on the 22d of January, 1934, duly enacted an ordinance authorizing and directing the mayor to issue and sell to the federal government the bonds authorized in the sum of $1,312,-500. Among other things, this ordinance provided that the amount of money to be raised by taxation for the payment of the principal and interest of the bonds should be as we have more fully set out above in quoting a similar provision in the ordinance of the preceding September. Thereafter, and pursuant to section 186c-1 et seq. of the Kentucky Statutes and Ky. Stats. Supp. 1933, sec. 186c-6 et seq., this suit was brought in order to obtain the approval of a court of competent jurisdiction as to the validity of the proposed bond issue. The petition elaborately set out the various steps taken in the authorization and creation of the indebtedness here involved, and the issuance of the bonds therefor, and also the financial condition of the city of Lexington which disclosed that this bond issue was within constitutional limitations as to amount of indebtedness authorized to be incurred. The appellant as a citizen and taxpayer of the city of Lexington was made defendant and called upon, acting for himself and all other citizens and taxpayers of Lexington, to set up what objections he might have to the validity of this bond issue. Answer was filed and proof heard which sustained the allegations of fact set out in the petition, and thereupon judgment was entered upholding the validity of this bond issue and the ordinances in connection therewith. From that judgment, this appeal is prosecuted.

The sole question presented on this appeal is whether or not the board of commissioners of the city of Lexington in failing to provide for the raising of any sinking fund for this bond issue during the first five years of the bond issue period has violated section 159 of the Constitution, which reads:

"Whenever any city, town, county, taxing district or other municipality is authorized to contract an indebtedness, it shall be required, at the same time, to provide for the collection of an annual tax sufficient to pay the interest on said indebtedness, and to create a sinking fund for the payment of the principal thereof, within not more than forty years from the time of contracting the same."

In so far as the instant question is concerned, we have been cited to no case in this state construing section 159, nor have we by independent search been able to find such precedent. The provisions of section 159 of the Constitution first appeared in this Constitution of 1890. There was in the third Constitution no regulations concerning the right of local subdivisions to become indebted. That they had done so and that the situation had become a grave one is apparent from even a casual reading of the Constitutional Debates of 1890. The Convention of 1890 met on Monday, September 8th, of that year. Three days after it convened, the delegate from Union county, Mr. I. A. Spaulding, presented a resolution which was adopted, calling upon the auditor of public accounts to ascertain and report to the convention as early as practicable the financial standing of each county, city, town, and tax district with reference to its outstanding indebtedness. On the next day, Mr. Rodes, one of the delegates from Warren county, offered the following resolution which was referred to the committee on resolutions:

"Resolved that it is the sense of this Convention that Sections 35 and 36 of the present Constitution, Article II, should be retained substantially in its revision so far as limiting and restricting the Legislature in the creation of debts against the state and the principle involved in said sections should be extended and applied in a similar manner as to the creation of indebtedness by counties, cities or towns and other political or corporate subdivisions of either." (Debates, vol. 1, p. 85.)

Section 36, article 2, of the third Constitution (1850) provided:

"No act of the general assembly shall author-ize any debt to be contracted on behalf of the commonwealth, except for the purposes mentioned in the thirty-fifth section of this article, unless provision be made therein to lay and collect an annual tax sufficient to pay the interest stipulated, and to discharge the debt within thirty years; nor shall such act take effect until it shall have been submitted to the people at a general election, and shall have received a majority of all the votes cast for and against it: Provided, That the general assembly may contract debts, by borrowing money to pay any part of the debt of the State, without submission to the people, and without making provision in the act authorizing the same for a tax to discharge the debt so contracted, or the interest thereon."

This section 36 of the third Constitution became section 50 of the present Constitution which provides:

"No act of the general assembly shall authorize any debt to be contracted on behalf of the Commonwealth except for the purposes mentioned in sec. 49, unless provision be made therein to levy and collect an annual tax sufficient to pay the interest stipulated, and to discharge the debt within thirty years; nor shall such act take effect until it shall have been submitted to the people at a general election, and shall have received a majority of all the votes cast for and against it: Provided, The general assembly may contract debts by borrowing money to pay any part of the debt of the state, without submission to the people, and without making provision in the act authorizing the same for a tax to discharge the debt so contracted, or the interest thereon."

Mr. Rodes' resolution was that the principle in-volved in these sections should be extended and applied to the creation of indebtedness by counties, cities, or towns; and so it was that the sections we now have in our Constitution concerning this matter of indebtedness, and especially section 159, found their way into that in-strument. A reading of section 36 of article 2 of the third Constitution and of section 50 of the present Constitution, bearing in mind the situation which confronted

the Constitution makers at the time they drafted this section 36, a situation of a debt huge for those times and incurred during the period following 1835 when the state embarked on a program of a very large extension of public credit in the matter of internal improvements, convinces one that the Constitution makers intended by these sections to couple with the authority of the Legislature to create a debt, the obligation on its part not only to raise by taxation the money necessary to pay the annual interest on such debt but also the obligation to levy an annual tax sufficient to amortize the debt within the period of the bond issue, and sufficient to meet the bonds when and as they fell due either serially or at the end of the bond issue period as the character of the bonds might be. Any other construction of these sections would inevitably lead to one of two conclusions: First, that the Legislature could postpone for as long as it wished even to the last year of the bond issue if the bonds all fell due at the end of the bond issue period the raising of the money wherewith to pay the debt. But it had been found that when the postponement of raising the money to pay a bond issue had been allowed, bond issues fell due without any adequate provision made for their payment and the burden of meeting a large bond issue at maturity, without provision having been made therefor during the life of the bonds, was too great for the people to bear. The other conclusion which might be reached is that although the Constitution does require a sinking fund to be created by taxes each year from the beginning of the bond issue period, there is no particular amount of money for sinking fund directed to be raised, and hence the Legislature may in its discretion provide a very small sinking fund in the earlier years of the bond issue. Such a conclusion would lead to practically the same result as that reached where the Constitution is construed so as to permit the Legislature to postpone the raising of any sinking fund for as long as it desires. But, as stated, it is clear that the end which the constitutional makers were endeavoring to attain was the equitable spreading out over the period of the bond issue of the burden of meeting that bond issue. Thus would creditors be protected in that there would be raised in amounts easily to be paid by the taxpayer a sum sufficient to discharge the debt when and as it became due either serially or at the end of the bond issue period, and thus also would the taxpayer be protected in having his burden equitably spread out over a

period of years, nor could one generation thrust upon another generation the payment of a bond issue, the expenditure of which resulted as much in favor of the first generation as it did or would in favor of the second generation. The whole idea was equality of burden and ease of bearing it. We are convinced that the provisions of section 36 of the third Constitution and section 50 of the present Constitution, the principles of which were carried over into section 159 of the latter instrument, mean that not only is the Legislature and the political subdivisions required to raise by annual taxation money sufficient to discharge the interest on the bond issue or indebtedness, but also to annually and from the inception of the creation of the debt to raise by taxation an amount sufficient to amortize the bond issue when and as the same falls due either serially or at the end of the bond issue period as the character of the bonds may be according to well-known amortization principles. We are aware that the result thus reached differs from that reached by the Supreme Court of Idaho in the case of Boise City v. Union Bank & Trust Co., 7 Idaho, 342, 63 P. 107, which permitted a city to postpone the creation of a sinking fund for as much as nine years after the bond issue had been floated, and this in face of a constitutional provision quite similar to the one we have. The Idaho court without any reasoning of the proposition and by mere ipse dixit stated that this was a substantial compliance with the Constitution, a conclusion with which in all deference to the Idaho court we cannot agree.

The conclusion we have reached with reference to section 159 of the Constitution, however, does not invalidate the authorization of this bond issue had at the November, 1933, election. The question submitted to the voters and which was carried by the requisite number thereof was as is more fully hereinbefore set out. In substance, it was whether the city should incur this debt which was to be paid, both principal and interest, "out of taxes to be levied by the city annually during the period of 30 years beginning with the year 1934 and ending with the year 1963." This was the question which was affirmatively carried. The electors are charged with notice that the Constitution requires that there must be levied an annual tax from the beginning of the bond issue period not only to pay the interest, but also to provide for the sinking fund as hereinbefore set out, and hence when these electors agreed in November,

1933, that both "principal and interest" of the bond issue they were authorizing was to be paid "out of taxes to be levied by the city annually during the period of 30 years beginning with the year 1934 and ending with the year 1963," they must be held to have agreed that the taxes to be raised annually were for both purposes —principal and interest—throughout the entire period. True it is that the ordinance which directed submission to the people of the question of creating this debt by a section subsequent to the one directing the form of the question to be submitted to the voters, provided how the debt, principal and interest was to be paid, and in so doing failed to provide for any sinking fund for the first five years of the bond issue period. But the ordinance could not override constitutional provisions. Hence when the people by an affirmative answer to the question submitted to them authorized the city to create the debt and to levy an annual tax from 1934 to 1963 sufficient to pay the debt, principal and interest, they must be taken to have authorized the payment of the debt to be done in a constitutional manner, and which in nowise conflicted with the affirmative vote on the actual question submitted to them. It follows that the creation of the debt here involved has been validly authorized, and that the city had authority to pass the ordinance of January 22, 1934, except in so far as that ordinance failed to provide for a sinking fund from the inception of the bond issue period. It is yet open to the city by ordinance alike in all respects to that passed in January, except as to this matter of a sinking fund provision for which provision must be made in accordance with the principles of this opinion, to authorize the mayor to issue these bonds and to sell them as the January ordinance provided. Except as to this question of the sinking fund, we find that the lower court's judgment concerning the validity of the steps taken to create this indebtedness and of the validity of this bond issue is correct and to such extent its judgment is affirmed. In so far as the court held that the January ordinance was valid even with reference to the sinking fund provision, it is reversed with instructions to enter a judgment in conformity with this opinion.

Whole court sitting.