Roscoe R. DALTON, a Taxpayer Suing Individually and on Behalf of All Taxpayers of Kentucky, Appellant,

v.

STATE PROPERTY and BUILDINGS COMMISSION et al., Appellees.

Court of Appeals of Kentucky.

June 21, 1957.

Dissenting Opinion July 8, 1957.

As Modified Aug. 12, 1957.

John E. Tarrant, Earl S. Wilson, Bullitt, Dawson & Tarrant, Louisville, for appellant.

Jo M. Ferguson, Atty. Gen., Astor Hogg, Hal O. Williams, Asst. Attys. Gen., and Joseph J. Leary, Frankfort, of counsel, for appellees.

STANLEY, Commissioner.

The case tests the validity and strength of the foundation of a proposed issue of bonds of the Commonwealth of Kentucky in the aggregate of $100,000,000, the proceeds of which are to be used to match funds that may be allocated to Kentucky for highway construction by the national government. The proposition was submitted to the voters at the November, 1956, election and resulted in 511,656 votes being cast in favor and 85,635 votes cast against it. The circuit court adjudged the Act constitutional, and the proceedings thereunder proper. The court construed the Act and the resolution of the State Property and Buildings Commission (KRS 56.450) which more particularly prescribes the terms of the bonds and the marketing of them.

The case is before this court on an appeal and a cross-appeal. Twenty-three issues as to validity and construction of the Act pleaded were disposed of below. It may be said that in general outline the attack is upon (1) the Act as a whole, and (2) certain provisions therein. It is then argued that if only part of the Act is invalid, the entire project must fail since the people voted to incur the debt according to all the provisions of the Act and not just part of them. Questions concerning the construction of the Act and the validity of certain parts of the resolution of the State Property and Buildings Commission putting it into effect are also submitted.

▆▆▆ At the threshold we deem it appropriate to make some preliminary observations. A challenge of the sufficiency of a law under constitutional provisions is not a technical objection to be treated lightly by the courts. Indeed, it is the sworn duty of the court to enforce provisions of the Constitution irrespective of the consequences. But one of the most firmly established principles of constitutional law, and an oft-repeated mandate of the courts, is that the wisdom or expediency of enactments of the Legislature is not for the courts to pass upon. This may be said to have special pertinency in matters of fiscal policy and authority to levy taxes and to appropriate the revenue. Nor are we concerned with the question of whether this project is based upon sound or unsound economic theories or is the best means to achieve the desired results. That is not within the scope of judicial inquiry. So, the wisdom of imposing the debt of one hundred million dollars and freezing all or as much as may be required of the highway taxes and revenue for the next thirty years is of no concern whatever to the court. All this was within the legislative responsibility and its power provided it was not restricted by the Constitution.

The project is based upon § 50 of the Kentucky Constitution. It prohibits the General Assembly from authorizing a debt to be contracted on behalf of the Commonwealth (with certain exceptions stated in § 49 and an obsolete provision in § 50) "unless provision be made therein to levy and collect an annual tax sufficient to pay the interest stipulated, and to discharge the debt within thirty years; nor shall such act take effect until it shall have been submitted to the people at a general election, and shall have received a majority of all the votes cast for and against it." The General Assembly at its Second Extraordinary Session, which convened March 9, 1956, passed an act, Chapter 3, authorizing the execution, sale and delivery of one hundred million dollars ($100,000,000) principal amount of Commonwealth of Kentucky bonds, the proceeds from the sale of which will be used to match federal funds for the construction of highways, bridges

and tunnels in the Commonwealth of Kentucky, and providing for the submission thereof to the voters at the general election to be held on November 6, 1956. The Act is now published as § 171.580 et seq. of the Kentucky Revised Statutes.

We abridge general provisions of the Act which are not the object of special attack and state more fully the provisions upon which the challenges are based.

*Section 1* declares that, subject to the provisions of §§ 49 and 50 of the Constitution, "there is hereby contracted on behalf of the Commonwealth", as a direct obligation "a debt * * * of one hundred million dollars ($100,000,000)" for the purposes stated.

*Section 2* provides that coupon bonds shall be issued in a described manner and form. It further declares, "All of said bonds shall bear interest at such rate, not exceeding three per cent per annum, as said Commission shall determine at the time of such issue. All of said bonds shall bear date of January 1, 1957."

*Section 3* requires that the bonds bear serial numbers and "shall mature on such dates, with such provisions as to prior redemption including premiums therefor, as may be determined by the State Property and Buildings Commission, providing that all of such bonds shall mature within thirty years from January 1, 1957."

*Section 4,* the heart of the Act, is heavily assailed. It is quoted in full.

"Section 4. The bonds herein provided for shall be direct obligations of the Commonwealth of Kentucky, and the full faith and credit of the Commonwealth hereby is pledged for the payment of said bonds and the interest thereon. In order to provide for the payment of the principal of all of said bonds at their maturity and the interest thereon annually as same shall accrue, there shall be levied and collected in each of the thirty years from January 1, 1957, to January 1, 1987, taxes for the benefit of the State Road Fund in the form of license, excise taxes and fees relating to registration, operation and use of vehicles on public highways and excise taxes, use and license taxes relating to gasoline and other motor fuels used upon the public highways in Kentucky at rates not less than the rates now imposed by law or so adjusted as to produce for the Road Fund not less than the amount now derived from all of such taxes. All funds derived from such taxes hereby are appropriated to the extent necessary for the payment of the principal and interest on said bonds. From the funds derived from said taxes in each year, beginning January 1, 1957, there shall be set aside and held inviolable for that purpose, a fund sufficient to pay the principal and interest on said bonds in each year as and when due until all of said bonds and the interest thereon shall have been paid in full. In each year, after setting aside the funds hereinabove provided, the remainder of the funds derived from such taxes may be expended and used for the cost of administration, statutory refunds and adjustment, payment of highway obligations, cost of construction, reconstruction, right of ways, maintenance and repair of public highways, tunnels and bridges and the expense of enforcing state traffic and motor vehicle laws, provided that all the funds collected under KRS Chapter 138 and required by KRS 138.220, 138.565(3) and 138.660(3) to be set aside by the Department of Highways for the construction, reconstruction and maintenance of rural and secondary roads shall be first set aside and used for such purposes."

*Section 5* permits the sale of bonds at different times "in units of not less than five million dollars principal amount as and when the money to be derived from the issuance and sale of said bonds may be needed. The State Property and Build-

ings Commission shall determine the time when and the principal amount of said bonds that shall be advertised and sold."

*Section 6* prescribes the manner and time for advertising a proposed sale of bonds and provides that, "None of said bonds shall be sold at less than par and accrued interest, and each advertisement for bids shall so state. Said Bonds shall be sold to the highest and best bidder. Said State Property and Buildings Commission shall have the right to reject any and all bids. Any premium and accrued interest received shall be deposited in the sinking fund provided by this Act [1] for the payment of said bonds and interest thereon."

*Section 7* directs that the Commission "shall specify such terms for the bonds that are not inconsistent with the provisions of this Act."

*Section 8* authorizes the Commission to invest the sinking fund [1] in bonds of the United States or to purchase bonds authorized by this Act or to deposit the amounts in a Kentucky bank upon adequate security.

*Section 9* relates to the holding and investment of the proceeds of the sale of the bonds to be issued under authority of the Act and provides that the same "shall be used solely and only by the Department of Highways of the Commonwealth of Kentucky to match federal funds allocated to Kentucky for the construction and reconstruction of highways, tunnels and bridges within the Commonwealth of Kentucky."

*Section 10* directs the submission to the people at the general election of 1956 and the notice thereof. It prescribes the form of the question to be placed on the ballot shall be: "Are you in favor of the Act of the General Assembly known as Senate Bill No. 3, enacted by the Second Extraordinary Session of the General Assembly of 1956, authorizing the Commonwealth to issue and sell bonds of the principal amount not exceeding one hundred million dollars

($100,000,000), to provide funds to match federal aid in the construction and reconstruction of highways, bridges and tunnels in Kentucky?" The section contains provisions that if the majority of the votes cast on the question are in favor of this Act, "then all provisions of this Act other than those contained in this section, shall become operative on and including the first day of January, 1957."

*Section 11* defines "year" as used in the Act.

*Section 12* reads: "All acts and laws and parts of acts and laws in conflict herewith, to the extent of such conflict, hereby are repealed."

I.

The most troublesome question is whether provision has been made for "*an annual tax*" as is required by the Constitution.

Section 50 of the Constitution, quoted above, declares that no contract shall be made or debt incurred by the State "unless provision be made" in the Act of the General Assembly "to levy and collect an annual tax sufficient" to pay interest upon and discharge the debt within thirty years. Sections 1 and 4 of this Act very specifically declare that the proposed contract and bonds shall be "direct obligations of the Commonwealth of Kentucky" and pledge "the full faith and credit of the Commonwealth" for the payment of the debt. But the provision for paying the debt is confined to "license, excise taxes and fees" arising from the sale and use of motor vehicles, gasoline and other motor fuels. It provides that currently and in the future these taxes and fees shall be "first set aside and used for" that purpose. Are these special taxes and fees such a tax as is contemplated by the Constitution? It may be observed in passing that this section of the Constitution is the same as § 36, Art. 2, of the previous Constitution of 1850. See McDonald v. City of Lexington, 253 Ky. 585, 69 S.W.2d 1065. Of course, motor

---

1. None is provided.

vehicles and such taxes here made applicable to the payment of the debt were unknown when the Constitution was adopted. These taxes constitute a class separate and distinct from tangible ad valorem property taxes. They are indirect and specific taxes. See Foster & Creighton Co. v. Graham, 154 Tenn. 412, 285 S.W. 570, 47 A.L.R. 971, 975. None of them is regarded as or is in fact an "annual tax." That term is ordinarily understood to mean a direct ad valorem tax. See 43 Am.Jur., Taxation, §§ 25, 26, 34, 83, 1261. " 'Annual tax' means one that is levied each year." People ex rel. Ogg v. Central Ill. Public Service Co., 328 Ill. 440, 159 N.E. 797, 798. Though the registration and licenses may be collected annually, the motor fuel and sale excises are daily taxes.

There are two decisions of other courts in point. In both of them the acts of the legislatures providing for the issuance of the bonds were declared to be unconstitutional because the taxes which they provided for their payment were not the kind of taxes which the respective constitutions prescribed.

One of those cases is State ex rel. Fletcher v. Executive Council of State, 207 Iowa 923, 223 N.W. 737. Section 5, art. 7 of the Iowa Constitution, I.C.A. is the same as our § 50 except for the use of the word "direct." The language is, "and such law shall impose and provide for the collection of a direct annual tax, sufficient to pay" the debt. A road bond issue of $100,000,000 had been voted. In addition to what the court called a "purported provision" for a direct tax for the payment of the bonds, the act provided for the budgeting of primary road funds in such way that the bonds should in fact be paid out of such funds rather than by means of a direct tax. This road fund came from gasoline taxes, motor vehicle licenses, etc. which the court held to be *indirect* taxes. The act pledged these funds as irrevocable so long as any bond was outstanding, and declared that no legislature could in the future repeal those taxes. The court held this was bad because no legislature can guarantee the span of life of its legislation beyond the period of the biennium. This court is in accord. Billeter & Wiley v. State Highway Commission, 203 Ky. 15, 261 S.W. 855. "One General Assembly" the Iowa court said, "may not lay its mandate upon a future one. Only the Constitution can do that." [207 Iowa 923, 223 N.W. 740.] It was noted that "In the absence of any constitutional provision to such effect, no General Assembly has power to render its enactment irrevocable and unrepealable by a future General Assembly." The court observed that had a direct tax been levied as provided in the Constitution, future legislatures would be bound because the Constitution authorized it. The court therefore held that the irrevocable pledge of the highway taxes was wholly ineffective and void. Section 12 of the Act purported to levy a direct tax, but it was in fact merely qualified or alternative or substitutional. After analyzing the section, the court wrote:

"The net result of section 12, like that of sections 13 and 15, is that it pledges the license and gasoline taxes to a primary liability for the payment of the debt. This is a purported substitution of these indirect taxes for the direct tax. Thereby the section becomes doubly invalid, because the Legislature had power neither to *pledge* nor to *substitute* an indirect tax for a direct one."

The other case is State ex rel. Capitol Addition Bldg. Comm. v. Connelly, 39 N.M. 312, 46 P.2d 1097, 100 A.L.R. 878. The legislature of New Mexico passed an act authorizing the construction of an addition to the capitol for the use of the judiciary and the issuance and sale of debenture bonds not to exceed $175,000 and appropriated that sum for the purpose, Laws 1934, Sp.Sess. 0.14. A sinking fund was to be raised by imposing a fee of $2.50 upon every civil action filed in the district courts. The act declared the bonds to be irrevocable contracts between the state and the holders of the bonds and that the tax on the

filing of the suits should not be reduced so long as any of the bonds were outstanding and unpaid. The court held that the bonds were payable only from the special fund and did not constitute a general obligation or debt of the state within the purview of the Constitution, particularly § 8 of Art. 9 dealing with the debt contracting power of the state. That section required that the law authorizing such a debt should provide "for an annual tax levy sufficient to pay the interest and to provide a sinking fund to pay the principal of such debt within fifty years from the time of the contracting thereof." The reason for the conclusion of the court was that the term "annual tax" has reference not to an excise tax but to a tax upon property which recurs periodically and is based upon ownership of wealth as a measure of ability to pay and that the tax on filing suits was not "an annual tax."

We turn to our own cases.

Crick v. Rash, 190 Ky. 820, 229 S.W. 63, resembles the instant case in that the obligations assumed by the state were to be paid out of special funds produced by county bond issues. Under a system of road building provided by the Legislature by an Act of 1920, c. 17 counties were authorized to create bonded debts and lend or advance the proceeds to the state for the construction of primary roads in such counties. The State Highway Commission would then issue certificates covering the loan or advancement to be paid to the county when the road project was completed, whether out of the special fund or not. This court held that the debt evidenced by the certificates was valid only to the extent that the Department had on hand or available during the year sufficient funds from sources already provided for which were unappropriated or not contracted against to meet the aggregate of all outstanding indebtedness, and held that any debts thereafter created were within the limitations of §§ 49 and 50 of the Constitution and to that

extent were void. In short, the opinion holds that it was of no consequence that there would be future resources from special funds, because they could not be constitutionally anticipated.

In 1924 the Legislature (c. 122) provided for the issuance of $75,000,000 of bonds. Three-fourths of the proceeds were to be used for highway construction. The other fourth was to be used to pay a floating debt of the state and the balance divided among several state institutions. Before the proposition was submitted at an election, the validity of the act and the proposed bonds was challenged. The challenge rested upon only three grounds, (1) the title and act covered a multiplicity of subjects and undertook to amend other statutes by reference only, (2) the act did not itself levy a tax for the payment of the bonds, and (3) there was an unlawful delegation of power to various departments and boards.

A quotation from the act in the opinion shows there were appropriated and set aside as inviolable all funds received from (a) automobile licenses, (b) gasoline tax, and (c) a fractional part of "direct ad valorem tax of the Revenue Act of 1924 for the construction, reconstruction, maintenance and repair of roads and highways, and for the payment of the interest on and for the creation of a sinking fund for the liquidation of State bonds issued for roads and other purposes."

The court did not consider the character of the taxes. We held the grounds upon which the contention of unconstitutionality of the act rested were not sustainable and directed a judgment validating the act. Allen v. Cromwell, 203 Ky. 836, 263 S.W. 356.[2]

In the consideration of the formidable and vital question concerning the meaning and comprehension of "annual tax" as used in § 50 of the Constitution in relation to the case at bar, we, of course, recognize the underlying principle that

2. The bond proposition was rejected at the election.

there is a presumption of constitutional validity of a legislative act and the universal rule that a liberal construction is given to constitutional limitations, reasonable doubts being resolved in favor of validity. This judicial position of saving legislation if possible is rooted in the doctrine that a state constitution is not a grant of power but is a limitation on the power of the Legislature and that that department of government possesses and may exercise within constitutional limits all legislative powers as it sees fit. It may enact any law not expressly or impliedly prohibited by the Constitutions of the state or the nation. McCreary v. Fields, 148 Ky. 730, 147 S.W. 901.

■ Allen v. Cromwell, supra, tacitly approved the pledge of motor vehicle licenses and fees, although it was accompanied by the commitment of an annual ad valorem tax. Cognizance must be taken of the fact that the Constitution confers on the General Assembly authority to provide for the imposition of license fees and a "special or excise" tax. Sec. 181. More influential is an amendment adopted in 1944 which recognizes these taxes "relating to gasoline and other motor fuels" and requires that money derived therefrom shall be expended only for the construction and maintenance of public roads and the "payment of highway obligations." Sec. 230. Thus, such taxes have become stabilized; therefore, are within the meaning of "an annual tax."

In all the circumstances, we reach the conclusion that the pledge and commitment of the Act is to provide a tax in each of the thirty years as may be deemed annually sufficient to pay annual and other timely requirements of the bond issue, and that this is a substantial compliance with § 50 of the Constitution.

## II.

■ It is argued that the vast amount to be paid as interest has the effect of making the indebtedness greater than $100,000,-

000. There is some authority to sustain the contention but the weight of the authority is that interest to become due in the future is not considered an indebtedness within the debt limitations. 43 Am.Jur., Public Securities and Obligations, § 301; 38 Am. Jur., Municipal Corporations, § 439. The Supreme Court held in Sutliff v. Lake County, 147 U.S. 230, 13 S.Ct. 318, 37 L.Ed. 145, that interest is not regarded as part of a bonded indebtedness of a municipality for the purpose of determining whether such indebtedness is within the constitutional limit. This Act clearly reveals that the sum of $100,000,000 is the principal sum and that interest that will accrue and be paid is additional thereto.

## III.

■ Section 50 of the Constitution prescribes that provision be made in the act "to levy and collect an annual tax" sufficient to pay interest on and discharge the debt within thirty years. It does not require that the particular initiating act shall itself make the levy. Allen v. Cromwell, supra, 203 Ky. 836, 263 S.W. 356.

The appellant argues that § 4 of the Act does not comply with the mandatory requirement of the Constitution that provision be made for a tax, but if it does, then the provision is void because the bill originated in the Senate, and § 47 of the Constitution requires that all bills raising revenue must originate in the House of Representatives.

■ We do not think the point is sustainable in either respect. Provision is built into the Act. We construe it as appropriating revenues already being raised and committing the State to continue such taxes or so much as may be necessary to pay the bonds and interest. The Act does not purport to raise revenue or to increase taxes. To "raise revenue" means to levy a tax as a means of collecting revenue. Ballentine's Law Dictionary, p. 1084. If additional taxes of this character should in the future be imposed for this or other purposes, such a bill would,

of course, be one for raising revenue; but we do not regard freezing or stabilizing present revenue as doing so.

## IV.

■ Appellant submits that the Act unconstitutionally diverts funds from purposes for which the taxes have been imposed. Section 180 of the Constitution declares that "no tax levied and collected for one purpose shall ever be devoted to another purpose." Section 230 provides that no money derived from excise and license taxation and fees relating to gasoline and other motor fuels, vehicles, their registration and operation, etc. shall be expended for other than specified highway purposes. It was held in Keck v. Manning, 313 Ky. 433, 231 S.W.2d 604, that the purpose of the gasoline antidiversion amendment to the Constitution, § 230, was not to curtail the road program but to make secure the funds with which to continue it, so it was held that expenditures by the Highway Department for advertisement, etc. were not a diversion. The purposes and objects for which the proceeds of the bonds to be issued under the present Act are to be used are clearly within the terms of § 230 of the Constitution. The costs of preparing the bonds, advertising and marketing them are essential parts of the whole. Crick v. Rash, 190 Ky. 820, 229 S.W. 63.

## V.

■ It is contended that the form of the question appearing on the ballot did not give sufficient and proper notice to the electorate of what they were voting upon. The question (see § 10 of the Act, outlined above) asked whether the voter was in favor of the Act authorizing the "Commonwealth to issue and sell bonds" to provide funds to match federal aid in the construction, etc. of highways, etc. This did not give notice of the character of the bonds

as general obligations of the State (as distinguished from revenue bonds, which have become a popular method of public financing) to be paid for by the hypothecation of all or a substantial part of the motor vehicle taxes and fees for a period of thirty years; nor did the question indicate that such allocation will have precedence over all other money available for construction and maintenance of highways and rural and secondary roads.

There is no provision in § 50 of the Constitution in regard to notice of the proposed referendum. Section 178 of the Constitution does provide that all laws authorizing the incurrence of debt by the State and its political subdivisions must specify therein the purpose for which the money is to be used. That purpose was not only specified in the Act but in a general way was contained in the question placed on the ballots in accordance with the Act. The form of the question and the character of the notice to the public were within the legislative power to prescribe. See Allen v. Cromwell, 203 Ky. 836, 263 S.W. 356; King v. Katterjohn, 193 Ky. 359, 236 S.W. 250; Burke v. City of Louisville, Ky., 275 S.W. 2d 899. If it was not sufficient, the fault was in the Legislature.

The Act required its publication "once a week for four consecutive weeks next preceding the week of the general election * * * in at least three newspapers of general circulation." It was published in full in nine newspapers under a large heading, "Notice of Election."

We may well agree with counsel that probably the number of voters who read the Act were few and not many who did, understood its entire significance and import. Doubtless, many of the people could hear nothing but the siren promise of nine hundred million dollars of "free" federal money.[3] However, it must be assumed that before voting the people informed themselves of the liabilities they will incur as

---

3. The circuit court held the Act permits the matching of federal funds on either a nine to one basis or *any other ratio.*

well as the benefits they will receive under the proposition submitted to them.

We think the word "bonds" in the question on the ballot was not misleading. The word has a well-known dictionary meaning when used as the evidence of a public debt. The term "revenue bonds" is a descriptive qualification indicating that the instruments are payable solely from a revenue producing public project. The word "bonds" needed no definition or indication that they were *not* revenue bonds or any other special kind.

## VI.

This disposes of the substantial questions of unconstitutionality which have been urged on the appeal. So, we do not reach the point that if any part of the Act should be declared invalid, the entire Act is rendered ineffective because the deleted parts may have operated as an inducement to an affirmative vote. See State ex rel. Fletcher v. Executive Council of State, supra, 207 Iowa 923, 223 N.W. 737, 742, so holding.

The other questions concern the interpretation or construction of the terms of the Act and of the resolution of the administrative commission putting them into effect.

## VII.

What is the meaning and extent of the provision of § 4, "The bonds herein provided for shall be direct obligations of the Commonwealth of Kentucky and the full faith and credit of the Commonwealth hereby is pledged for the payment of said bonds and the interest thereon?" The circuit court adjudged that the bonds will be direct and general obligation bonds of the Commonwealth, and the full faith and credit of the Commonwealth will be pledged for the payment of such bonds and interest.

There are two views as to the proper response.

One is that the "direct obligations" are as described and limited by the Act and that

the commitment of full faith and credit of the Commonwealth is confined to the sources of revenue described therein, that is, a pledge to continue those taxes at the present rate, or at rates "so adjusted" by increasing them so as to produce funds sufficient to meet the obligations, and to do nothing more.

The second view is that in case there should ever be a deficiency by reason of the insufficiency of the designated resources, the Commonwealth, without qualification or limitation, *must* levy ad valorem taxes or taxes of some other kind or increase the present rates sufficiently to meet the demands of the debt.

The majority of the members of the court accept the second view and concur in the judgment of the circuit court. The others believe the first view is sustained by reason of § 50 of the Constitution requiring that no debt may be contracted without provision being made therein to levy and collect a sufficient amount of the taxes described, and there was only a qualified provision. This view is supported by State v. Citrus County, 116 Fla. 676, 157 So. 4, 97 A.L.R. 431.

## VIII.

Is any portion of the gasoline and other taxes excluded from the appropriation of the pledge for the payment of the bonds and interest?

KRS 138.220 imposes an excise tax of seven cents per gallon on all gasoline received in this state [4] and directs the Department of Highways to set aside two-sevenths of such amounts received "for the construction, reconstruction and maintenance of rural and secondary roads and for no other purpose." KRS 138.565(1) imposes a seven cents excise tax on "Special Fuel" as therein defined and subsection (2) imposes an additional seven cents for "heavy equipment special fuel user." Subsection (4) provides that two-sevenths of

---

4. Certain refunds are authorized where the gasoline has been used for farm

tractors, stationary engines and aircraft. KRS 138.341, 138.344.

the amounts received from the taxes paid under subsection (1) shall likewise be set aside for rural and secondary roads and for no other purpose. KRS 138.660 imposes a tax of seven cents per gallon on gasoline used in operation of motor carriers on the public highways of the State and a surtax of two cents per gallon on every "heavy equipment motor carrier." Two-sevenths of the receipts from these taxes are required also to be set aside for rural and secondary highways "and for no other purpose."

It will be noted that § 4 of the bond issue Act refers to these several sections of the Statutes. The question is whether *all* of such funds thereby set aside for rural and secondary roads are excluded from the appropriation and pledge of funds for the payment of the bonds.

Section 4 of the Act declares, "*All* funds derived from such taxes [i. e. taxes for the benefit of the State Road Fund] hereby are appropriated to the extent necessary for the payment of the principal and interest on said bonds." Then follows a sentence declaring that from those funds in each year "there shall be set aside and held inviolable for that purpose, a fund sufficient to pay the principal and interest on said bonds" etc. Then follows this sentence, "In each year, after setting aside the funds hereinabove provided, the *remainder* of the funds derived from such taxes may be expended and used for the cost of administration, statutory refunds and adjustment, payment of highway obligations, costs of construction, reconstruction, right of ways, maintenance and repair of public highways, tunnels and bridges and the expense of enforcing state traffic and motor vehicle laws, provided that all the funds collected under KRS Chapter 138 and required by KRS 138.220, 138.565(3) and 138.660(3) to be set aside by the Department of Highways for the construction, reconstruction and maintenance of rural and secondary roads shall be first set aside and used for such purposes." (Our italics.)

The circuit court held *all* the two-sevenths part of the gasoline taxes imposed by those sections of the Statutes are *excluded* from the appropriation and pledge of revenue for the payment of the bonds. We think this is error. The proviso relating to setting aside the designated taxes follows a comma, thereby making the phrase a continuing and integral part of the one sentence which disposes of the *"remainder"* of the funds.

The general rule of statutory construction in relation to a proviso is thus stated in 50 Am.Jur., Statutes, § 438, as follows:

"The natural and appropriate office of a proviso is to modify the operation of that part of the statute immediately preceding the proviso, or to restrain or qualify the generality of the language that it follows. Indeed, the presumption is that a proviso in a statute refers only to the provision to which it is attached, and, as a general rule, a proviso is deemed to apply only to the immediately preceding clause or provision. It should be confined to what precedes, unless it is clear that it was intended to apply to subsequent matter."

In Newport Benevolent Burial Association v. Clay, 170 Ky. 633, 186 S.W. 658, 663, in an amendatory act consisting of two sections, Acts 1908, c. 72, there was a separate paragraph at the end of § 2 beginning, "Provided, however" that certain provisions of the act should not apply to certain corporations, etc. The question was presented to this court whether this proviso paragraph applied only to § 2 or applied to all sections of the act. The court ruled that the effect of the proviso was only to limit the requirements of § 2. In reaching the conclusion we said: "The common and accepted doctrine is that the operation of a proviso is usually confined to the clause or provision immediately preceding it, and it will be so applied, unless, in effecting the legislative intent, it is necessary to apply it to the other provisions of the act or to the

entire act." See also Muenninghoff **v.** Bartholomew, 269 Ky. 36, 106 S.W.2d 97.

■ Making such an application to the present Act, we construe it as meaning that the proceeds of *all such taxes* are to used for the payment of the bonded debt so far as may be necessary, and that in distributing the "remainder," priority or preference must be given to the two-sevenths of the taxes described for use on the rural and secondary roads of the State.

■ The appellant submits that the taxes described in KRS 47.020 are likewise appropriated for the payment of the bonds, although that section is not expressly referred to in the Act, because of § 12, the repealing provision. KRS 47.020 (the original of which has been in the Statutes for a long time) provides that "one-half of all revenue raised by the tax imposed by subsections (3) to (8) of KRS 186.050 shall be evenly distributed among all the counties, for the county road funds." These sections relate to registration fees of trucks and buses. We think no part of the one-half of these fees which is required to be distributed to the counties is committed for payment of the bonds because that part of the receipts never gets into the "State Road Fund," which is the resource specified in the Act. We approve the circuit court's ruling excluding this county road revenue.

## IX.

It is noted that the Act, § 2, provides "All of said bonds shall bear interest at such rate, not exceeding three percent per annum, as said Commission shall determine at the time of such issue." The State Property and Buildings Commission adopted a resolution setting forth a schedule or plan to issue these bonds in specified units or blocks with specified maturity dates. The schedule shows that bonds maturing in the period 1958–1967 would bear 4% interest coupons; The next block, maturing during 1968–1973, would bear 2.60%; the next block maturing during 1974–1980, would bear 2.75%; and the final block, maturing 1981–1987, would bear 2.80%. Under this plan the aggregate interest payable would be $47,451,000, or an average rate of 2.8758181% per annum, while the aggregate interest at the uniform rate of 3% on each bond would be $49,500,000. Whether or not this plan would work out may be problematical, but the stubborn fact is the Act itself is specific in providing that "All of said bonds" shall bear interest "not exceeding three percent per annum."

■ The Attorney General submits various dictionary definitions of "all" and argues, with some degree of plausibility, that the phrase, "All of said bonds," means "the whole of said bonds," and thereby the Act provides that the bonds *collectively* should not bear more than three per cent interest, permitting an *average* rate of that per cent or less. We think this strains the meaning of "all" in this relationship. We believe the Legislature meant "each and every" bond and that it intended that none of the bonds should bear interest in excess of three per cent. It is noted that § 2 of the Act likewise provides that "All of said bonds shall bear date of January 1, 1957." [5] It further says, "All of said bonds and the interest thereon shall be exempt" from taxation. These provisions negate the view that the provision, "All of said bonds shall bear interest" not to exceed three per cent means that some may bear more than that rate if some bear less. The circuit court construed the Act to mean that no bond "may bear interest at a rate greater than three per cent (3%) per annum." We agree. Golden Gate Bridge and Highway District v. Filmer, 217 Cal. 754, 21 P.2d 112, 91 A.L.R. 1, is in accord.

---

5. But § 6 provides that upon the sale of the bonds all matured interest coupons shall be detached and destroyed.

## X.

Section 3 of the Act provides that the bonds "shall mature on such dates, with such provisions as to prior redemption including premiums therefor, as may be determined by the State Property and Buildings Commission" etc. The resolution of the Commission follows the language of the Act in general but leaves open the determination of the dates of maturity and provisions for prior redemption, including premiums that might be paid in consideration thereof to be fixed by supplemental resolutions before the respective blocks of bonds shall be issued and sold.[6] The circuit court held invalid the provision of the resolution for the payment of premiums upon redemption of the bonds where the premiums and interest exceed three per cent per annum.

█ Section 3 of the Act plainly authorizes the redemption before maturity of any bonds upon the payment of a premium. We recognize this practice as being in conformity with good financial usage and see no legal objection to the provision. However, the amount and method of payment of redemption premiums must conform to sound banking and fiscal practices existing at the time the bonds are issued and sold.

## XI.

█ The judgment declares that before setting aside funds to pay the bonds and interest, prior contractual obligations must be adequately provided for by first setting aside (a) all funds required by KRS Chapter 177 and a certain trust agreement for the cost of maintaining, repairing and operating the turnpike between Louisville and Elizabethtown, the cost of construction having been derived from revenue bonds; (b)

all funds required by KRS Chapter 180 and certain trust indentures securing bridge revenue bonds now outstanding to pay the cost of operating and maintaining the bridges; and (c) all sums required to be paid under contracts of the Department of Highways which are in existence on the respective dates any bonds are issued pursuant to this Act. But, the judgment declared, "Title 23 of the United States Code and the acceptance of federal aid by the Commonwealth of Kentucky thereunder does not create any encumbrance or claim upon or against the funds derived from any of the aforesaid taxes."[7]

This part of the judgment is clearly correct.

## XII.

The conclusion of the whole matter is that the judgment should be affirmed except as it relates to the preference of funds for rural and secondary roads and premiums for redemption or pre-mature payment of the bonds.

The judgment is affirmed on direct and cross-appeals except it is reversed for modification to conform to Divisions VIII and X of this opinion.

MONTGOMERY, J., dissents.

SIMS, Judge (concurring).

Since I am not in full accord with the majority opinion, I deem it appropriate to write a brief concurring one.

Under § 4 of the Act, I do not think the bonds voted are a direct obligation of the Commonwealth or that the full faith and credit of the Commonwealth is pledged for the payment of the bonds and interest. It is

---

6. The Commission has the right at the time of the issuance to reserve an option to redeem the bonds before maturity. Mitchell v. Knox County Fiscal Court, 165 Ky. 543, 177 S.W. 279; Percival v. City of Covington, 191 Ky. 337, 230 S.W. 300.

7. The Chief Engineer of the Highway Department testified that the obligations for maintenance and operation of toll bridges and the turnpike, independent of the tolls collected, will not exceed $400,000 in any year; and the Commissioner of Revenue testified that the annual budget of the Highway Department anticipates revenue of $75,000,000 a year.

my conclusion that § 4 of the Act limits the taxes from which the bonds are to be paid to "taxes for the benefit of the State Road Fund in the form of license, excise taxes and fees relating to registration, operation and use of vehicles on public highways and excise taxes, use and license taxes relating to gasoline and other motor fuels used upon the public highways in Kentucky."

The special session of the General Assembly in 1956 could not bind successive sessions in this State to maintain the rate of the excise and use taxes mentioned in § 4 of the Act at their present levels. Nor could it agree to increase the rates of such taxes so as to guarantee these taxes will produce for the next thirty years the same amounts in revenue they are now producing, or produce sufficient revenues to meet the payment of these bonds. No General Assembly under our Constitution has the authority or right to tie the hands of future General Assemblies. Billeter & Wiley v. State Highway Commission, 203 Ky. 15, 261 S.W. 855. This is a fundamental rule in constitutional law, where the Constitution does not provide otherwise, as was pointed out in State v. Executive Council of State, 207 Iowa 923, 223 N.W. 737. Hence this enormous bond issue must, in my judgment, be satisfied out of the existing taxes set out in § 4 of the Act as successive sessions may fix the rates thereof. However, this fact does not affect the legality of the bonds because the taxes out of which they are to be satisfied now annually produce a State Road Fund of 75 million dollars, and it does not appear this revenue will be reduced in the future—on the contrary it looks like it will be increased.

The question submitting this bond issue to the voters never mentioned that the bonds could be satisfied by a general tax levy. To my mind it is doubtful that the voters ever intended to saddle upon posterity this huge debt which may be satisfied according to the majority opinion by a general tax levy in the event the excise taxes provide insufficient funds to pay the bonds. In accordance with public policy, courts as a general rule, wherever possible, uphold the validity of voted bonds unless clear grounds for invalidating them are shown. 43 Am.Jur., "Public Securities and Obligations", § 78, p. 335. In my judgment this court has striven with all its might and main to uphold these bonds because they were voted by the tremendous majority of 6 to 1. I am in accord with the majority opinion that the issue is valid, except I believe that the bonds must be satisfied out of the excise taxes set out in § 4 of the Act, and that the 1956 General Assembly cannot freeze such taxes at their present levels or bind future General Assemblies to increase the rates thereof.

It may not be wholly inappropriate to say that had the test been presented before the referendum vote—as was done in the case of Allen v. Cromwell, 203 Ky. 836, 263 S.W. 356—the majority would probably not be so constrained to attribute so dubious a meaning to or expand the meaning of "an annual tax" beyond what the framers of the Constitution contemplated and what is generally recognized as its meaning; nor would the majority have held one General Assembly could bind successive sessions and bar repeal of or reduction in these license and excise taxes. Perhaps had the people completely recognized the significance and import of the Act, their enthusiasm for voting the debt upon themselves would have been dulled.

I am in accord with the majority of my brethren except as pointed out in this concurring opinion.

MONTGOMERY, Judge (dissenting).

I dissent from the majority opinion on two principal grounds: (1) the question which presented the issue to the voters is defective, and (2) the Act authorizing the bonds failed to provide for the levy and collection of an annual tax as required by Section 50 of the Kentucky Constitution.

Because of the shortness of time, a more elaborate opinion has not been prepared, but one will be prepared and handed down later.

July 8, 1957.

MONTGOMERY, Judge (dissenting).

I respectfully dissent from the majority opinion of the Court.

The Act in question is unconstitutional, in that it violates two provisions of Section 50 of the Constitution. It fails to provide for the levy and collection of an annual tax to pay the interest stipulated and to discharge the debt created. The question submitted to the people at the general election was misleading and was neither fair nor adequate to inform them of the issue presented. The proper construction of the language of this section of the Constitution is decisive.

The pertinent portion of Section 50 of the Kentucky Constitution is quoted:

"No act of the General Assembly shall authorize any debt to be contracted on behalf of the Commonwealth * * * unless provision be made therein to levy and collect an annual tax sufficient to pay the interest stipulated, and to discharge the debt * * * nor shall such act take effect until it shall have been submitted to the people at a general election, and shall have received a majority of all the votes cast for and against it * * *".

Section 50, together with its companion, Section 49, have been a part of the organic law of this Commonwealth since 1850. Hager v. Gast, 119 Ky. 502, 84 S.W. 556, 27 Ky.Law Rep. 129. See Kentucky Constitution, 1850, Article 2, Sections 35 and 36. Respect and veneration for age require that every consideration should be exerted to ascertain its meaning. As a safeguard of governmental solvency, it stands as a foundation rock on an equal plane with the Bill of Rights and the principle of separation of governmental powers. The success of this protective device against fiscal folly is shown by the fact that only two efforts have been made during its history to create a debt under its provisions. Until now, the Commonwealth of Kentucky has maintained the freedom of its citizens from bonded indebtedness under this bar. In view of its history, the bar should not lightly be cast down.

The people are the source of all authority in a state. By the adoption of a constitution, the people grant authority to be exercised in accordance with the separation of the three fundamental branches of government: executive, legislative, and judicial. In the exercise of the respective functions of government, each branch is limited in the performance of its particular function only by the state and federal constitutions, subject to control by the people.

Under the principle of separation of governmental powers, the legislative power of the state is vested in the state legislature, our General Assembly. The power of the legislature is derived from the people through the Constitution. It is a generally recognized and oft repeated principle that except where limitations have been imposed, either by the federal or state constitution, the power of the state legislature is unlimited and practically absolute, covering the whole range of legitimate legislation. Griswold v. Hepburn, 2 Duv. 20, 63 Ky. 20. Such is the authority conferred upon the General Assembly by the people of the Commonwealth under our Constitution since 1850. Banks v. Commonwealth, 145 Ky. 800, 141 S.W. 380; McCreary v. Field, 148 Ky. 730, 147 S.W. 901; Scott v. McCreary, 148 Ky. 791, 147 S.W. 903. Any and every act of the legislature repugnant to or prohibited by either the state or federal constitution is null and void. The specific restraints imposed by the Constitution upon the legislature must be respected. 49 Am. Jur., Constitutional Law, Sections 33 and 36, pages 250 and 252.

Sections 49 and 50 of the Kentucky Constitution are restraints upon the General Assembly. In Rhea v. Newman, 153 Ky. 604, 156 S.W. 154, 158, 44 L.R.A.,N.S., 989, this Court, speaking through Miller, J., said:

"It will be noticed that the Constitution nowhere restricts the debt-creating

power of the state; at most, it merely regulates the method of using the power. * * * the state, * * * being the sovereign political power, may create debts without limit, and has an unlimited taxing power for use in the discharge of the debt. The only regulations put upon the state's power to create a debt are found in sections 49 and 50, supra; the first of said sections providing that the Legislature alone may create an indebtedness of $500,-000; and any indebtedness beyond that limit must, under section 50, have the approval of the people at a general election, and a specific tax levied for its payment."

The purpose of these sections is "to curb the extravagant spirit of the people", as expressed by Thomas, J., in Crick v. Rash, 190 Ky. 820, 229 S.W. 63. It is to prevent the creation of a debt to be paid by the taxpayers of this Commonwealth except as incurred specifically in the manner provided therein. In view of the objective to be attained, the language of these sections should be strictly construed to carry out their purpose. Otherwise, the sections may be emasculated by the knife of liberal construction. The majority opinion accomplishes such a result.

The effect of the opinion is to hold that licenses, fees, and excise taxes collected in connection with the operation of motor vehicles and the use of motor fuels on the public highways in Kentucky are annual taxes within the meaning of Section 50. This strained construction of the phrase "an annual tax", as used in that constitutional section, is illogical and without basis in legal precedent. The only suggested legal precedents are Allen v. Cromwell, 203 Ky. 836, 263 S.W. 356, and Crick v. Rash, supra.

The attack upon the validity of the Act authorizing a bond issue in Allen v. Cromwell was based on alleged violations of Section 51 of the Constitution. The following statement of the issue contained in the opinion of Clarke, J., is conclusive of the question decided:

"The lower court assigned three reasons for holding the act violative of this section, and counsel for appellees list separately nine other alleged grounds of invalidity, but all of the court's reasons and many of appellee's are found upon analysis to be but variant statements of the single contention that the act, in both its title and body, embraces more than a single subject."

By way of dictum, the opinion discussed an objection raised under Section 50 but did not discuss or decide the precise question with which we are now confronted as to what is meant by "an annual tax", which the Court, in the majority opinion in the instant case, says is the "most troublesome question" to be considered. The majority opinion, in discussing the Cromwell opinion, says: "The court did not consider the character of the taxes." Obviously, Allen v. Cromwell cannot be considered as an authority for the construction of the phrase in question.

There was no question of the meaning of "an annual tax" considered in Crick v. Rash, supra, and it does not sustain the majority opinion. In fact, Sections 157 and 157a, considered in Crick v. Rash, provide for an annual tax and refer to an ad valorem tax on property. Thus, we are confronted with a "substantial compliance" without sound basis.

The conclusion in the majority opinion is reached that a pledge or commitment has been made to provide "a tax in each of the thirty years as may be deemed annually sufficient to pay annual * * * requirements of the bond issue * * *". This is the view taken by the dissenting Judge in State ex rel. Capitol Addition Bldg. Comm. v. Connelly, 39 N.Mex. 312, 46 P.2d 1097, 100 A.L.R. 878. The majority opinion in the New Mexico case is adverse to the majority opinion of this Court, as is State ex rel. Fletcher v. Executive Council of State, 207 Iowa 923, 223 N.W. 737, also cited.

As pointed out in the majority opinion, citing the Iowa case, the pledge of motor

vehicle licenses, etc., is not binding upon any subsequent General Assembly. Billeter & Wiley v. State Highway Commission, 203 Ky. 15, 261 S.W. 855. The Iowa case was concerned with "a direct annual tax", with the Court holding that motor vehicle licenses, etc., were not direct taxes. It did not consider whether they were annual taxes. The New Mexico case expressly held that "annual tax levy" referred to a tax on property which recurs periodically and is based on ownership of wealth as a measure of ability to pay and did not refer to an excise tax.

In State ex rel. Boynton v. Kansas State Highway Commission, 138 Kan. 913, 28 P.2d 770, 773, sections of the Kansas Constitution concerning debt limitation were considered. These sections are strikingly similar to our Sections 49 and 50. The Kansas constitutional section Article 11, § 5, refers to the "levying of an annual tax sufficient to pay the annual interest of such debt, and the principal thereof." The Supreme Court of Kansas, in construing this section of their Constitution, held that an annual tax was a general property tax; property was considered as the basis of taxation; and the purpose of such debt limitation sections was to guard against incurring debts in excess of the stated limitation payable by a general property tax without the question having been submitted to and adopted by the people. It said:

"They were not dealing with the question of obligations to be paid only by special tax, such as on motor vehicles or motor fuels, or from funds raised in some manner other than by general property tax."

The word "annual" is one of common and ordinary usage. Welch v. Board of Education of Magoffin County, Ky., 247 S.W.2d 536. "The rule for the interpretation of Constitutions, as universally applied, is that the language therein is to receive its plain and ordinarily understood meaning by the generality of the people",

so said Thomas, J., in Crick v. Rash, supra [190 Ky. 820, 229 S.W. 68]. In Jefferson County ex rel. Grauman v. Jefferson County Fiscal Court, 273 Ky. 674, 117 S.W.2d 918, 924, it was said:

"Neither legislatures nor courts have the right to add to or take from the simple words and meaning of the constitution."

"Annual" has been defined as occurring once a year or yearly. Horne v. Kenosha Lincoln-Mercury, Inc., 265 Wis. 496, 61 N.W.2d 893; People ex rel. Will County Fair Association v. Stanard, 9 Ill.App.2d 550, 133 N.E.2d 757; Rolerson v. Standard Life Insurance Company, Tex.Civ.App., 244 S.W.2d 845; Southern Service Company v. Los Angeles County, Cal., 82 P.2d 397.

The conclusion reached after consideration of the authorities cited herein and in the majority opinion is that the phrase "an annual tax" as used in Section 50 of the Kentucky Constitution by its framers meant an ad valorem tax on property to be levied and collected once each year and did not mean licenses, fees, or excise taxes. Reference to various sections of the Constitution bolsters this conclusion. Section 171 refers to "annual tax" on "property". Section 172 provides a basis for assessment of property for taxation. Sections 174 and 181 make a distinction between taxation of property and "taxation * * * based on income, licenses, or franchises". Sections 180 and 181 specifically provide for excise and license taxes. Reference to KRS Chapter 66, concerning the issuance of bonds by counties, cities, and districts, indicates a legislative construction that voted bonds should be made payable from an annual ad valorem tax levy on property as distinguished from licenses, fees, and excise taxes.

This is in accord with the doctrine of contemporaneous construction. In construing the Constitution, the terms employed therein should be given the meaning which had been put upon them and which they

possessed at the time of the framing and adoption of the Constitution. McKinney v. Barker, 180 Ky. 526, 203 S.W. 303, L.R.A. 1918E, 581; Herold v. Talbott, 261 Ky. 634, 88 S.W.2d 303. Licenses, fees, and excise taxes on motor vehicles and fuels certainly were not included in the meaning of "an annual tax" by the framers of our Constitution. The Act in question based upon such taxes is invalid for failure to provide for the levy and collection of an annual tax within the meaning of the Constitution.

Turning now to a consideration of the question submitted to the people at the general election, the effect of the majority opinion is a holding that the full faith and credit of the Commonwealth of Kentucky is pledged to secure the payment of $100,-000,000 and interest. The meaning of this is that any form of taxation may be levied upon the income and property of the people to pay this debt. The full impact of this meaning has not reached the voting public yet. Without agreeing with such a conclusion, it will be discussed in relation to the form of the question which submitted this matter to the vote of the people. The question is contained in the fore part of the majority opinion.

In holding the form of the question to be sufficient, the majority opinion recognized that it did not give notice of the character of the bonds as a general obligation of the Commonwealth.

Section 50 provides that the debt limitation may be exceeded only after approval of the people at a general election. In order that the people may intelligently vote, the question should present the essentials of the proposition. The question should have advised the people that they were voting an indebtedness for which taxes in any form might be placed upon them in order to satisfy it.

The majority opinion refers to "the siren promise of $900,000,000 of 'free' federal money". It is only fair to note that the publicity and propaganda concerning the bond issue was of the same "free ride" tenor. The people were not advised that the bonds to be issued were general obligation bonds of the Commonwealth or that their taxes might be raised to pay them. The word "bond" could just as well have referred to revenue bonds, with which the people were probably more familiar than with general obligation bonds. There was nothing in the question to indicate the character of the bonds. The form of the question should have indicated in some way how the debt to be incurred was to be paid.

The phrasing of the question should have made it clear to the voters that they might have to pay additional taxes to satisfy the debt. The framers of the Act apparently were careful to draw it so that the bonds would be general obligations of the Commonwealth and backed by the full taxing power of the state. The phrase "general obligation bonds" was inserted in the title of the Act. The bonds were described in Section 1 as "directly obligating the Commonwealth". The beginning sentence of Section 4 is: "The bonds herein provided for shall be direct obligations of the Commonwealth of Kentucky, and the full faith and credit of the Commonwealth hereby is pledged for the payment of said bonds and the interest thereon." Thus, every effort appears to have been exerted to make sure that the full taxing power of the Commonwealth would be obligated to pay the bonds.

By inserting the phrase "general obligation bonds" in the title of the Act, this effect of the Act was made known to the legislators, and properly done so. In Frost v. Johnston, 262 Ky. 592, 90 S.W.2d 1045, 1048, the purpose of Section 51 of the Constitution was held "to require titles that will disclose to the reader the nature of the act, and thus prevent vicious legislation being enacted under innocent and misleading titles". See also State Budget Commission v. Adams, 249 Ky. 680, 61 S.W.2d 314; Anderson v. Wayne County, 310 Ky. 597, 221 S.W.2d 429.

By the same reasoning, the question submitting the matter to the people should have included the additional phrase "general obligation" in front of the word "bond" in order to advise them of the obligation undertaken; that is, that they might have to pay for the so-called "free ride" in the end. If it is necessary for the legislators to be advised that they are authorizing "general obligation bonds", then shouldn't the question make this known to the people who will have to pay for them?

The question submitted is whether the voter is in favor of a certain Act of the General Assembly instead of creating a debt. It is no answer to say that a reading of or the publication of the contents of the Act would have disclosed its contents and meaning. If this be true, then the question need only have asked whether the voter favored a certain Act, without any details. The conclusion to be drawn is that the form of the question was unfair, inadequate, and misleading, and the bonds, therefore, are invalid as not having been properly approved by the people under Section 50.

The validity of the proposed bond issue is one of the most important matters to concern the people of Kentucky and to be decided by this Court in many years. In considering this case and in preparing this dissent, it is regrettable that more time is not available. The two objections made herein to the validity of the bonds are not exclusive of others that might be more readily apparent with further time for consideration. The provision in Section 5 of the Act for the sale of the bonds "as and when the money * * * may be needed" presents an equally serious problem. Under the language of the Act, a finding of need is a condition precedent to the advertising and sale of the bonds. This opinion has been unduly prolonged, and I hesitate to extend it on this point.

The following quotation from Varney v. Justice, 86 Ky. 596, 6 S.W. 457, 459, 9 Ky. Law Rep. 743, approved by Carroll, J., in Board of Penitentiary Commissioners v. Spencer, 159 Ky. 255, 166 S.W. 1017, has been used as a guide in construing the Constitution:

"It is an instrument of words, granting powers, restraining powers, and reserving rights. These words are fundamental words, meaning the thing itself; they breathe no spirit except the spirit to be found in them. To say that these words are directory merely, is to license a violation of the instrument every day and every hour. To preserve the instrument inviolate, we must regard its words, except when expressly permissive, as mandatory, as breathing the spirit of command."